[Civ. No. 20843. Fourth Dist., Div. Two. Dec. 27, 1979.]

CITY OF SANTA ANA, Plaintiff and Appellant, v.
CITY OF GARDEN GROVE et al., Defendants and Respondents.

COUNSEL

Keith L. Gow, City Attorney, Edward J. Cooper, Assistant City Attorney, and Richard E. Lay, Deputy City Attorney, for Plaintiff and Appellant.

George Deukmejian, Attorney General, E. Clement Shute, Jr., Assistant Attorney General, Mark I. Weinberger and Timothy R. Patterson, Deputy Attorneys General, as Amici Curiae on behalf of Plaintiff and Appellant.

Eric Lauterer, City Attorney, for Defendants and Respondents.

OPINION

TAMURA, Acting P. J.—The City of Santa Ana appeals from an order denying its petition for administrative mandamus seeking review and annulment of a resolution of the City Council of the City of Garden Grove amending its general plan by redesignating a parcel of land on which the boundaries of the City of Santa Ana abut from low density residential to industrial. The thrust of the petition was that the City Council of Garden Grove abused its discretion under the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.) in adopting a negative declaration instead of preparing an environmental impact report (EIR) before taking the challenged action. The trial court denied the petition on the sole ground that CEQA does not apply to an amendment to a general plan.

The pertinent facts may be briefly stated. Subject parcel consists of 54.27 acres in the City of Garden Grove located at the northwest corner of the intersection of Euclid Street and Hazard Avenue. The boundaries of Santa Ana lie directly south of Hazard Avenue and east of Euclid Street. Garden Grove initiated proceedings to amend its general plan by changing the land use designation of the parcel from low density residential to industrial. Based upon a preliminary study of the environmental impact of the proposed amendment, the city council adopted a negative declaration finding that the redesignation would not have a significant effect on the environment. Following a public hearing, the city planning commission recommended against the redesignation on grounds that the surrounding area is predominantly residential, the existing circulation system would be unsuitable for industrial use and the proposed designation would not be the highest and best use of the property. The city council held a public hearing and remanded the matter to the planning commission for reconsideration. On reconsideration, the planning commission again recommended against the redesignation. The city council, however, adopted a resolution amending the general plan stating that redesignation "will allow for the highest and best use of the property and is consistent with the city's goal of establishing a significant commercial and industrial tax base."

Santa Ana filed the instant proceeding alleging that the City of Garden Grove abused its discretion in adopting a negative declaration instead of preparing an EIR. Garden Grove's response was twofold: First, it contended that an amendment to a general plan is not a project requiring compliance with CEQA. Secondly, it maintained that there was substantial evidence supporting the adoption of the negative declaration and that there had been no abuse of discretion in failing to prepare an EIR. The trial judge rendered a memorandum of intended decision in which he held that CEQA does not apply to the enactment of an amendment to a city's general plan and that the provisions of section 15037, subdivision (a)(1), of the state's EIR Guidelines (Cal. Admin. Code, tit. 14, § 15000 et seq., hereafter, Guidelines) to the contrary were in excess of the rule-making power of the Office of Planning and Research and the Secretary of the Resources Agency (hereafter, Resources Agency).[1] Accordingly, the court denied the petition for writ

---

[1] All code references are to the Public Resources Code unless otherwise indicated.

Section 21083 provides: "The Office of Planning and Research shall prepare and develop proposed guidelines for the implementation of this division by public agencies. Such guidelines shall include objectives and criteria for the orderly evaluation of proj-

of mandate without addressing the question whether the adoption of a negative declaration instead of preparing an EIR constituted an abuse of discretion under CEQA.

 In the analysis which follows we conclude that CEQA does apply to the adoption of an amendment to a general plan and that the matter should be remanded to the trial court for further proceedings consistent with that conclusion.

DISCUSSION

The answer to the question whether CEQA applies to an amendment to a general plan depends upon the scope of CEQA and the nature and effect of the governmental decision involved in the adoption or amendment of a general plan.

The statutory scheme of CEQA begins with a sweeping definition of

---

ects and the preparation of environmental impact reports and negative declarations in a manner consistent with this division.

"Such guidelines shall specifically include criteria for public agencies to follow in determining whether or not a proposed project may have a 'significant effect on the environment'. Such criteria shall require a finding that a project may have a 'significant effect on the environment' if any of the following conditions exist:

"(a) A proposed project has the potential to degrade the quality of the environment, curtail the range of the environment, or to achieve short-term, to the disadvantage of long-term, environmental goals.

"(b) The possible effects of a project are individually limited but cumulatively considerable. As used in this subdivision, 'cumulatively considerable' means that the incremental effects of an individual project are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects.

"(c) The environmental effects of a project will cause substantial adverse effects on human beings, either directly or indirectly.

"Such guidelines shall also include procedures for determining the lead agency pursuant to the provisions of Section 21165.

"Such guidelines shall also include criteria for public agencies to use in determining when a proposed project is of sufficient statewide, regional, or areawide environmental significance that it should be submitted to appropriate state agencies for review and comment prior to completion of an environmental impact report or negative declaration thereon.

"The Office of Planning and Research shall develop and prepare such proposed guidelines as soon as possible and shall transmit them immediately to the Secretary of the Resources Agency. No later than 60 days after the effective date of this section the Secretary of the Resources Agency shall certify and adopt such guidelines pursuant to Chapter 4.5 (commencing with Section 11371) of Part 1, Division 3, Title 2 of the Government Code, which shall become effective upon the filing thereof, provided that such guidelines shall not be adopted withou' compliance with Sections 11423, 11424, and 11425 of the Government Code."

the term "project" as any activity "directly undertaken by any public agency" (§ 21065, subd. (a)). The act then, however, limits its application generally to "discretionary projects" ( § 21080, subd. (a)) with certain specific statutory exceptions (§ 21080, subd. (b)) and exemptions authorized by the Guidelines adopted pursuant to section 21084 (§ 21085).

In describing the projects to which the act applies, section 21080, subdivision (a), provides: "(a) Except as otherwise provided in this division, this division shall apply to discretionary projects proposed to be carried out or approved by public agencies, *including, but not limited to,* the enactment and amendment of zoning ordinances, the issuance of zoning variances, the issuance of conditional use permits and the approval of tentative subdivision maps (except where such a project is exempt from the preparation of an environmental impact report pursuant to Section 21166)." (Italics supplied.)

Although the adoption and amendment of general plans are not mentioned in section 21080, subdivision (a), neither are they exempted, either by the act or the Guidelines. Indeed, section 15037 of the Guidelines provides in pertinent part: "(a) Project means the whole of an action, which has a potential for resulting in a physical change in the environment, directly or ultimately, that is any of the following: [¶] (1) An activity directly undertaken by any public agency including but not limited to public works construction and related activities, clearing or grading of land, improvements to existing public structures, enactment and amendment of zoning ordinances, and *the adoption and amendment of local General Plans or elements thereof* pursuant to Government Code Sections 65100-65700." (Italics supplied.)

Garden Grove contends that insofar as section 15037, subdivision (a), of the Guidelines includes the adoption and annulment of general plans, it is in excess of the statutory authority conferred on the Resources Agency to adopt rules and regulations for the implementation of CEQA and is therefore invalid. Garden Grove argues that had the Legislature intended to make CEQA applicable to the adoption or amendment of general plans, it would have specifically said so in section 21080, subdivision (a); that the express mention of "amendment of zoning ordinances, the issuance of zoning variances, the issuance of conditional use permits and the approval of tentative subdivision maps," imports a legislative intention to exclude other types of discretionary governmen-

tal acts relating to land use such as the adoption or amendment of general plans. We do not so read the statute.

The *"expressio unius est exclusio alterius"* canon of statutory construction is inapplicable to the construction of section 21080, subdivision (a). The attempted application of the canon overlooks the phrase "but not limited to" which precedes the various governmental actions relating to land use specifically mentioned in section 21080, subdivision (a). Use of those words manifests a legislative intent that the statute not be given an *"expressio unius"* construction.

Furthermore, Garden Grove's restrictive interpretation of CEQA is incompatible with our Supreme Court's admonition that CEQA "be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Friends of Mammoth* v. *Board of Supervisors,* 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049]; *Bozung* v. *Local Agency Formation Com.,* 13 Cal.3d 263, 274 [118 Cal.Rptr. 249, 529 P.2d 1017].) Consistent with that policy, discretionary projects not expressly mentioned in section 21080, subdivision (a), have been held to be subject to CEQA. (*Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d 263, local agency formation commission approval of a city annexation; *People* ex. rel. *Younger* v. *Local Agency Formation Com.,* 81 Cal.App.3d 464 [146 Cal.Rptr. 400], local agency formation commission approval of deannexation from a city; *Edna Valley Assn.* v. *San Luis Obispo County etc. Coordinating Council,* 67 Cal.App.3d 444, [136 Cal.Rptr. 665], local transportation authority adoption of a regional transportation plan; *Shawn* v. *Golden Gate Bridge etc. Dist.,* 60 Cal.App.3d 699 [131 Cal.Rptr. 867], Golden Gate Bridge, Highway and Transportation District approval of increase in transportation rates.)

Garden Grove contends that the Resources Agency lacked the authority to adopt a regulation making the adoption or amendment of general plan projects subject to CEQA. The contention lacks merit. The statute confers upon the Resources Agency the authority to prepare and adopt guidelines "for the implementation" of the act by public agencies, including "objectives and criteria for the orderly evaluation of projects and the preparation of environmental impact reports and negative declarations in a manner consistent with" the act, and specifically to include "criteria for public agencies to follow in determining whether or not a proposed project may have a 'significant effect on the environ-

ment.'" (§ 21083, fn. 1, *ante.*) The implementing Guidelines are also to "include a list of classes of projects which have been determined not to have a significant effect on the environment and which shall be exempt from the provisions" of the act. (§ 21084, subd. (a).) Thus, the adoption of section 15037, subdivision (a), of the Guidelines was well within the rule-making power conferred on the Resources Agency. ■ Administrative agencies authorized to adopt implementing regulations are empowered to adopt such regulations as are reasonably necessary to effect the purpose of the statute. (See *Agricultural Labor Relations Bd. v. Superior Court,* 16 Cal. 3d 392, 411 [128 Cal.Rptr. 183, 546 P.2d 687]; *State of California v. Superior Court (Veta),* 12 Cal.3d 237, 249-250 [115 Cal.Rptr. 497, 524 P.2d 1281].)

■ The delegation to the Resources Agency of the power to adopt implementing guidelines does not, as Garden Grove contends, constitute an improper delegation of legislative power. ■ The doctrine prohibiting delegation of legislative power rests on the premise that the Legislature may not abdicate its responsibility to resolve the "truly fundamental issues" by delegating that function to others or by failing to provide adequate directions for the implementation of its declared policies. (*Kugler v. Yocum,* 69 Cal.2d 371, 376-377 [71 Cal.Rptr. 687, 445 P.2d 303].) ■ Where the Legislature has made the fundamental policy decisions and delegated to some other body the task of implementing those policies under adequate safeguards, there is no violation of the doctrine of nondelegability of legislative power. (*People* ex. rel. *Younger v. County of El Dorado,* 5 Cal.3d 480, 507 [96 Cal.Rptr. 553, 487 P.2d 1193]; *Kugler v. Yocum, supra,* 69 Cal.2d 371, 375-377; *CEEED v. California Coastal Zone Conservation Com.,* 43 Cal.App.3d 306, 325 [118 Cal.Rptr. 315].) ■ Here, the Legislature made the fundamental policy decisions (§§ 21000, 21001, 21002, 21002.1, 21003) and accompanied the delegation of rule-making power with appropriate and adequate directions and procedural safeguards (§ 21083). ■ Merely because a statute empowers an administrative agency to exercise a judgment of high order in implementing legislative policy does not mean that the agency has been given unrestricted powers. (*CEEED v. California Coastal Zone Conservation Com., supra,* 43 Cal.App.3d 306, 327.)

■ In determining whether general plan adoption and amendment properly come within the scope of CEQA, it is significant that from the initial publication of the Guidelines in 1973, section 15037, subdivision

(a), has included general plan enactments and amendments among the projects subject to the requirements of CEQA. ■ While the ultimate interpretation of a statute is an exercise of judicial power and it is the responsibility of the courts to declare its true meaning even if it requires rejection of an earlier administrative interpretation (*Culligan Water Conditioning* v. *State Bd. of Equalization,* 17 Cal.3d 86, 93 [130 Cal.Rptr. 321, 550 P.2d 593]; *Merrill* v. *Department of Motor Vehicles,* (71 Cal.2d 907, 917 [80 Cal.Rptr. 89, 458 P.2d 33]; *Crumpler* v. *Board of Administration,* 32 Cal.App.3d 567, 578 [108 Cal.Rptr. 293]), the contemporaneous construction of a statute by an administrative agency charged with its administration and interpretation, while not necessarily controlling, is entitled to great weight and should be respected by the courts unless it is clearly erroneous or unauthorized (*Judson Steel Corp.* v. *Workers' Comp. Appeals Bd.,* 22 Cal.3d 658, 668-669 [150 Cal.Rptr. 250, 586 P.2d 564]; *Rivera* v. *City of Fresno,* 6 Cal.3d 132, 140 [98 Cal.Rptr. 281, 490 P.2d 793]; *Coca-Cola Co.* v. *State Bd. of Equalization,* 25 Cal.2d 918, 921 [156 P.2d 1]; *State Compensation Ins. Fund* v. *Workers' Comp. Appeals Bd.,* 88 Cal. App.3d 43, 53-54 [152 Cal.Rptr. 153]). This is true particularly where there has been continued public reliance upon and acquiescence in such interpretations.[2] (*Broadway-Locust Co.* v. *Ind. Acc. Comp.,* 92 Cal.App.2d 287, 293-294 [206 P.2d 856]; *Prichard* v. *Southern Pacific Co.,* 9 Cal.App.2d 704, 706 [51 P.2d 428].) ■ In the present case the City of Garden Grove conducted its proceedings on the assumption that CEQA applies to an amendment to a general plan.

Garden Grove contends that CEQA applies to proposed changes in the physical world which a public agency is about to make, authorize or fund but not to a general plan which it says is a "plan" and nothing more, citing the statement in *Selby Realty Co.* v. *City of San Buenaventura,* 10 Cal.3d 110 [109 Cal.Rptr. 799, 514 P.2d 111], that a general plan "is by its very nature merely tentative and subject to change." (*Id.,* at p. 118.) Reliance on *Selby* is misplaced. The quoted

---

[2]Garden Grove argues that despite the acknowledged importance of general plans to the development and growth of cities and counties, since the Legislature has never amended section 21080, subdivision (a), of CEQA to include the enactment and amendment of general plans among the discretionary projects subject to CEQA such inaction indicates that the Legislature never intended to make such acts subject to CEQA. Subsequent legislative inaction is of little value in ascertaining legislative intent in the passage of a measure. (See *State Comp. Ins. Fund* v. *Workers' Comp. Appeals Bd., supra,* 88 Cal.App.3d 43, 63 [152 Cal.Rptr. 153]; *Miles* v. *Workers' Comp. Appeals Bd.,* 67 Cal.App.3d 243, 248 [136 Cal.Rptr. 508].) It could just as well be argued that the Legislature was satisfied with the administrative interpretation of CEQA.

statement from *Selby* was made in the context of an inverse condemnation case in which the plaintiff contended that the adoption of a general plan showing a portion of plaintiff's property as a street constituted a taking of its property. As the Supreme Court aptly stated in rejecting the contention: "The adoption of a general plan is several leagues short of a firm declaration of an intention to condemn property." (*Id.*, at p. 119.) The court explained that in order to state a cause of action for inverse condemnation, there must be an invasion or appropriation of some valuable property right which the landowner possesses and the invasion or appropriation must directly and specifically affect the landowner to his injury. (*Id.*, at pp. 119-120.) The amendability of general plans, however, does not distinguish them from zoning ordinances. The enactment and amendment of zoning ordinances are expressly made subject to CEQA (§ 21080, subd. (a)), yet such actions are subject to change and unless they deprive the landowner of substantially all reasonable use of his property, do not constitute a taking of property for a public purpose. (*Agins* v. *City of Tiburon*, 24 Cal.3d 266, 277 [157 Cal.Rptr. 372, 598 P.2d 25]; *HFH, Ltd.* v. *Superior Court*, 15 Cal.3d 508, 517-518 [125 Cal.Rptr. 365, 542 P.2d 237], U.S. cert. den., 425 U.S. 904 [47 L.Ed.2d 754, 96 S.Ct. 1495].)

The fact that the enactment or amendment of a general plan does not directly effect a physical change in the environment does not remove it from the scope of CEQA. To quote: "The notion that the project itself must directly have such an effect was effectively scotched in *Friends of Mammoth*. The granting of a conditional use permit—a piece of paper —does not directly affect the environment any more than an annexation approval—another piece of paper. *Friends of Mammoth*, of course, said that the word '"project" appears to emphasize activities *culminating* in physical changes to the environment,. . .' (*Id.*, at p. 265. Italics added.) In response to that concept, the Guidelines refer to 'physical impact on the environment, directly or *ultimately*.' (Cal. Admin. Code, tit. 14, § 15037. Italics added.)" (*Bozung* v. *Local Agency Formation Com.*, *supra*, 13 Cal.3d 263, 279.) Under current law, general plans do have an ultimate effect upon physical changes in the environment.

Statutory provisions for the adoption of general plans by cities and counties have been on the books for many years but until 1971 they were generally permissive in nature with "a relatively broad, amorphous scope and content." (Note, *Selby Realty Co.* v. *City Of San Buenaventura: How General Is The General Plan?* (1974) 26 Hastings L.J. 614,

618.) There was no requirement for the implementation of the general plan through zoning or subdivision approvals. The general plan was only "an idealistic statement of policy which might or might not be carried out" (Comment, *Land Development And The Environment: The Subdivision Map Act* (1974) 5 Pacific L.J. 55, 68); it was "in reality an interesting study without much direct relevance to day-to-day activity." (Note, *Selby Realty Co.* v. *City of San Buenaventura: How General Is The General Plan?, supra,* 26 Hastings L.J. 614, 621.)

In 1971 the Legislature enacted Assembly Bill No. 1301 which transformed the general plan from just an "interesting study" to the basic land use charter governing the direction of future land use in the local jurisdiction. (Stats. 1971, ch. 1446, p. 2852.) The bill enacted a provision requiring proposed subdivisions, together with the provisions for their design and improvements, to be consistent with the general plan. (Former Bus. & Prof. Code, § 11526, now recodified as Gov. Code, § 66473.5.[3]) The bill also enacted a provision requiring zoning ordinances to be consistent with the general plan of the city or county. (Gov. Code, § 65860.[4]) As a result, general plans now embody fundamental land use decisions that guide the future growth and development of cities and counties. The adoption or amendment of general plans perforce have a potential for resulting in ultimate physical changes in the environment and were properly included in section 15037, subdivision (a), of the Guidelines as projects subject to CEQA.

---

[3]Government Code section 66473.5 now provides: "No local agency shall approve a map unless the legislative body shall find that the proposed subdivision, together with the provisions for its design and improvement, is consistent with the general plan required by Article 5 (commencing with Section 65300) of Chapter 3 of Division 1 of this title, or any specific plan adopted pursuant to Article 8 (commencing with Section 65450) of Chapter 3 of Division 1 of this title.

"A proposed subdivision shall be consistent with a general plan or a specific plan only if the local agency has officially adopted such a plan and the proposed subdivision or land use is compatible with the objectives, policies, general land uses and programs specified in such a plan."

[4]Government Code section 65860 now provides: "(a) County or city zoning ordinances shall be consistent with the general plan of the county or city by January 1, 1974. A zoning ordinance shall be consistent with a city or county general plan only if:

"(i) The city or county has officially adopted such a plan, and

"(ii) The various land uses authorized by the ordinance are compatible with the objectives, policies, general land uses, and programs specified in such a plan.

"(b) Any resident or property owner within a city or a county, as the case may be, may bring an action in the superior court to enforce compliance with the provisions of subdivision (a). Any such action or proceedings shall be governed by Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure. Any action or proceedings taken pursuant to the provisions of this subdivision shall be taken

The application of CEQA to the adoption or amendment of a general plan also comports with the policy that the environmental consequences of a proposed activity, whether public or private, be considered at the earliest possible stage. "Obviously it is desirable that the precise information concerning environmental consequences which an EIR affords be furnished and considered at the earliest possible stage. The Guidelines express this principle in a variety of ways. Thus, 'EIR's should be prepared as early in the planning process as possible to enable environmental considerations to influence project, program or design.' (Cal. Admin. Code, tit. 14, § 15013.)" (*Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d 263, 282.) Compliance with CEQA at the general plan stage will not result in wasteful duplication of EIRs if one is required. The report prepared at the general plan stage may be used "as the foundation document for EIRs subsequently prepared for specific projects within the geographic area covered by the general plan." (Guidelines, § 15068.5.)

Finally, we note that while the precise issue before us has never been heretofore squarely decided, in determining whether other related governmental activities were subject to CEQA, courts have relied on the fact that the Guidelines have included general plan adoption and amendments among projects requiring compliance with CEQA. Thus, in *Bozung,* the court stated: "The fact is that if the adoption of a general plan is a project, as the Guidelines provide, an annexation approval by a LAFCO becomes an a fortiori case. While a general plan 'is by its very nature merely tentative and subject to change' (*Selby Realty Co.* v. *City of Buenaventura,* 10 Cal.3d 110, 118 [109 Cal.Rptr. 799, 514 P.2d 111]), a LAFCO approval of an annexation is an irrevocable step as far as that particular public agency is concerned." (*Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d 263, 278.) Similarly in *Edna Valley Assn.* v. *San Luis Obispo County etc. Coordinating Council, supra,* 67 Cal.App.3d 444, the court relied in part on section 15037, subdivision (a), of the Guidelines in rejecting the contention that the

within 90 days of the enactment of any new zoning ordinance or the amendment of any existing zoning ordinance as to said amendment or amendments.

"(c) In the event that a zoning ordinance becomes inconsistent with a general plan by reason of amendment to such a plan, or to any element of such a plan, such zoning ordinance shall be amended within a reasonable time so that it is consistent with the general plan as amended.

"(d) Notwithstanding Section 65803, this section shall apply in a charter city of 2,000,000 or more population to a zoning ordinance adopted prior to January 1, 1979, which zoning ordinance shall be consistent with the general plan of any such city by July 1, 1982."

adoption of a regional transportation plan by the County of San Luis Obispo was exempt from CEQA. The court noted that subdivision (a)(1) of section 15037 of the Guidelines defined project as including the adoption of a general plan or elements thereof and pointed to the similarity between a transit element of a general plan and the regional transportation plan before the court. (*Id.*, at p. 448.)

We conclude that the adoption or amendment of a general plan is a project which is subject to CEQA and that section 15037, subdivision (a)(1), of the Guidelines so providing is valid.

The order denying the petition for administrative mandamus is reversed and the trial court is directed to consider the petition on its merits.[5]

Kaufman, J., and McDaniel, J., concurred.

---

[5]The City of Santa Ana suggests that if we should conclude that CEQA applies to the action taken by the City of Garden Grove, we should decide the merits of the petition for administrative mandamus. It is urged that inasmuch as the scope of judicial review of the administrative action in the present case is the substantial evidence standard, the function of the trial court and this court on appeal from a judgment of a trial court is substantially identical insofar as the administrative record is concerned. Accordingly, Santa Ana argues that this court may review the administrative action for abuse of discretion despite the trial court's failure to do so. We respectfully decline the invitation. The City of Garden Grove has properly confined its brief to the sole issue involved on this appeal; namely, the applicability of CEQA to the enactment and amendment of general plans. Were we to undertake to determine the merits of Santa Ana's petition for administrative mandamus, the matter would have to be continued for further briefing, calendaring and argument. We believe the interests of justice would best be served by remanding the matter to the trial court for a trial on the merits of the petition.

Santa Ana's brief also requested attorney fees pursuant to the provisions of Government Code section 800 but at oral argument, the request was withdrawn.