[No. A027319. First Dist., Div. One. Oct. 20, 1986.]

DAVID C. HENINGER, Plaintiff and Respondent, v.
BOARD OF SUPERVISORS OF SANTA CLARA COUNTY et al.,
Defendants and Appellants.

**[Opinion certified for partial publication.*]**

---

*Pursuant to California Rules of Court, rule 976(b) and 976.1, this opinion is certified for publication with the exception of those portions noted by double brackets [[/]].

**COUNSEL**

Donald L. Clark, County Counsel, and Donald J. Fallon, Deputy County Counsel, for Defendants and Appellants.

Tichinin & Mitchell and Bruce Tichinin for Plaintiff and Respondent.

**OPINION**

**HOLMDAHL, J.**—This is an appeal from a judgment granting a peremptory writ of mandate, ruling that the Board of Supervisors of the County of Santa Clara violated the California Environmental Quality Act in failing to prepare an environmental impact report before adopting an ordinance which provided

for authorization for installation of alternative sewage disposal systems, and from a postjudgment order granting attorney's fees.

The judgment and order are affirmed.

### Statement of Facts and Procedural History

Mary Lee Eubanks owned land on Rolling Hills Drive, Morgan Hill, in Santa Clara County. She applied for a permit to install a septic tank on her property. Since her land had too high a percolation rate to be suitable for a conventional leach field for septic tank effluent, her permit application was rejected. She proposed, thereafter, to install an alternative system, by which her septic tank effluent would be piped into an imported mound of soil which would serve as a leach field. County counsel opined that the then-current county ordinance code conferred no authority for issuance of a permit for such an alternative sewage disposal system, and that an amendment to the code would be necessary for issuance of such a permit.

On June 28, 1983, the appellant Board of Supervisors of the County of Santa Clara[1] passed and adopted ordinance No. NS 517.29 (hereafter, the ordinance amendment), which amended the code so as to authorize the county health officer to issue permits for alternative private sewage disposal systems for single family residences, in addition to the conventional septic tank and leach field system provided for by the code.

Before its enactment of the ordinance amendment, the Board had adopted a "negative declaration" under section 21080, subdivision (c) of the California Environmental Quality Act (Pub. Resources Code, §§ 21000-21177,[2] hereafter, CEQA) on November 15, 1982.

On July 21, 1983, respondent David C. Heninger filed, in Santa Clara County Superior Court, a petition for peremptory writ of mandate and stay order, in which he requested the court to require the Board to rescind, void, and annul the ordinance amendment, and to enjoin appellants from issuing any permits or entitlements for sewage disposal systems pursuant to the ordinance. In his petition respondent alleged, among other shortcomings, that the Board had violated CEQA in failing to prepare an environmental impact report (hereafter, EIR) before enacting the ordinance amendment.

---

[1]Two county officials, other than members of the board of supervisors, and a county agency were also sued in the present action, and are also appellants. We refer in this opinion, hereafter, to the board of supervisors as the Board.

[2]All statutory references hereafter, unless otherwise noted, are to the Public Resources Code.

A hearing on the petition was held on October 31, 1983, and a judgment granting a peremptory writ of mandate was filed on January 25, 1984. The trial court found, among other things, that "there was no substantial evidence in the record to support a determination to adopt a negative declaration under CEQA" and that there was "substantial evidence in the record to support requirement that an Environmental Impact Report be prepared, reviewed and approved prior to ordinance adoption." The court declared the ordinance amendment null and void, and of no effect, and prohibited appellants from implementing or giving any effect to said ordinance.

On February 21, 1984, respondent filed a postjudgment motion for award of attorney's fees. The motion was heard and, on March 27, 1984, an order granting attorney's fees was filed, by which the Board was ordered to pay respondent's attorneys the sum of $13,982.40.

The appeal before us is from the judgment granting the peremptory writ of mandate and from the order granting attorney's fees.

### Necessity for an Environmental Impact Report

■ Section 21151 provides, "[¶] All local agencies shall prepare, or cause to be prepared by contract, and certify the completion of an environmental impact report on any project they intend to carry out or approve which may have a significant effect on the environment. . . ." Appellants properly accept the propositions that the Board is a "local agency" within the meaning of section 21151 (see §§ 21062, 21063) and that enactment of the ordinance amendment is a "project" within the meaning of section 21151. (See *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 277-279 [118 Cal.Rptr. 249, 529 P.2d 1017], interpreting § 21065;[3] *Rosenthal* v. *Board of Supervisors* (1975) 44 Cal.App.3d 815, 823 [119 Cal.Rptr. 282].) By accepting these propositions, appellants properly concede that CEQA applies in this case.

■ Appellants also properly accept the proposition that the Board was obliged to order an EIR if it could be fairly argued, based on substantial evidence in the record before the Board, that the ordinance amendment might cause a significant effect on the environment. This proposition is in

---

[3]Section 21065 provides:
"'Project' means the following:
"(a) Activities directly undertaken by any public agency.
"(b) Activities undertaken by a person which are supported in whole or in part through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies.
"(c) Activities involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."

accord with the holding of the Court of Appeal, First Appellate District, Division Four, in *Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 1001-1002 [165 Cal.Rptr. 514], based on *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 75 [118 Cal.Rptr. 34, 529 P.2d 66], and followed in several subsequent Court of Appeal decisions.[4] This proposition has won the approval of the state Office of Planning and Research, charged under section 21083 with the preparation of guidelines for implementation of CEQA. A new version of one of those guidelines, California Administrative Code, title 14, section 15070,[5] was filed July 13, 1983, for the express purpose of codifying the holding of *Friends of "B" Street*. (State Office of Planning and Research, CEQA: The Cal. Environmental Quality Act—Law and Guidelines (Jan. 1984) pp. 88-89.) Within two months, the Legislature enacted a new version of section 21080, subdivision (c),[6] containing provisions virtually identical to those of Guidelines, section 15070. (Stats. 1983, ch. 872, § 4.)

■ Lastly, appellants properly accept the proposition that the "significant effect on the environment" to which section 21151 refers is the effect to which enactment of the ordinance amendment may ultimately lead, not

---

[4]*Brentwood Assn. for No Drilling, Inc.* v. *City of Los Angeles* (1982) 134 Cal.App.3d 491, 503-505 [184 Cal.Rptr. 664]; *Pistoresi* v. *City of Madera* (1982) 138 Cal.App.3d 284, 288[188 Cal.Rptr. 136]; *Newberry Springs Water Assn.* v. *County of San Bernadino* (1984) 150 Cal.App.3d 740, 747-748 [198 Cal.Rptr. 100].

[5]California Administrative Code, title 14, section 15070 provides: "A proposed negative declaration shall be prepared for a project subject to CEQA when either:

"(a) The initial study shows that there is no substantial evidence that the project may have a significant effect on the environment, or

"(b) The initial study identified potentially significant effects but:

"(1) Revisions in the project plans or proposals made by or agreed to by the applicant before the proposed negative declaration is released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effects would occur, and

"(2) There is no substantial evidence before the agency that the project as revised may have a significant effect on the environment."

Hereinafter, the guidelines promulgated pursuant to section 21083 (Cal. Admin. Code, tit. 14, §§ 15000-15387) will be cited as Guidelines. The Guidelines are binding on all public agencies in California. (*City of Santa Ana* v. *City of Garden Grove* (1979) 100 Cal.App.3d 521 [160 Cal.Rptr. 907].)

[6]Section 21080, subdivision (c) provides: "If a lead agency determines that a proposed project, not otherwise exempt from the provisions of this division, does not have a significant effect on the environment, the lead agency shall adopt a negative declaration to that effect. The negative declaration shall be prepared for the proposed project in either of the following circumstances:

"(1) There is no substantial evidence before the agency that the project may have a significant effect on the environment.

"(2) An initial study identifies potentially significant effects on the environment, but (i) revisions in the project plans or proposals made by or agreed to by the applicant before the proposed negative declaration is released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effects would occur, and (ii) there is no substantial evidence before the agency that the project, as revised, may have a significant effect on the environment."

the de minimis effect of the "governmental paper-shuffling" which mere enactment of an ordinance entails. (See *Bozung* v. *Local Agency Formation Com.*, *supra*, 13 Cal.3d 263, 277-278, fn. 16; Guidelines, § 15378, subd. (a).)[7]

The parties disagree as to the appropriate standard for court review of the action of the Board. Appellants cite *Pacific Water Conditioning Assn., Inc.* v. *City Council* (1977) 73 Cal.App.3d 546, 558 [140 Cal.Rptr. 812], which holds that if the Board chose to reject or to ignore evidence that the ordinance amendment may have a significant effect on the environment, both the superior court and this court would be bound by that choice, so long as some substantial evidence was before the Board that the ordinance amendment would not have a significant effect on the environment.[8] Appellants go on to review evidence which, they contend, lends substantial support to their view that the ordinance amendment will have no significant effect on the environment.

■ *Friends of "B" Street,* however, explicitly rejects the standard of review applied in *Pacific Water Conditioning Assn., Inc.,* declaring that "an agency's adoption of a negative declaration is not to be upheld merely because substantial evidence was presented that the project would not have [significant environmental] impact. The . . . court's function is to determine whether substantial evidence supported the agency's conclusion as to whether the prescribed 'fair argument' could be made. If there was substantial evidence that the proposed project might have a significant environmental impact, evidence to the contrary is not sufficient to support a decision to dispense with preparation of an EIR and adopt a negative declaration,

---

[7]Guidelines, section 15378, subdivision (a) provides: "'Project' means the whole of an action, which has a potential for resulting in a physical change in the environment, directly or ultimately, and that is any of the following:

"(1) An activity directly undertaken by any public agency including but not limited to public works construction and related activities clearing or grading of land, improvements to existing public structures, enactment and amendment of zoning ordinances, and the adoption and amendment of local General Plans or elements thereof pursuant to Government Code Sections 65100-65700.

"(2) An activity undertaken by a person which is supported in whole or in part through public agency contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies.

"(3) An activity involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."

[8]*Pacific Water Conditioning Assn., Inc.* does not stand alone. As respondent fairly puts it, "There is support for this view in the following cases: *Hixson* v. *County of Los Angeles* (1974) 38 CA 3d 370, 379-83, 113 CR 433, *Running Fence Corp.* v. *Superior Court* (1975) 51 CA 3d 400, 423, 124 CR 339, and *Dehne* v. *County of Santa Clara* (1981) 115 CA 3d 827, 845, 171 CR 753, 763 all of which held that an EIR was not required despite the existence of some substantial evidence in the record tending to show that a significant effect might be had by the project."

because it could be 'fairly argued' that the project might have a significant environmental impact." (*Friends of "B" Street* v. *City of Hayward, supra,* 106 Cal.App.3d 988, 1002.)

In view of the express administrative codification of *Friends of "B" Street* effected by promulgation of Guidelines, section 15070, we consider the subsequent adoption of essentially the same language in section 21080, subdivision (c), to constitute an implicit legislative determination that *Friends of "B" Street* sets forth the correct standard for judicial review in cases of this type, and a rejection of the *Pacific Water Conditioning Assn., Inc.* standard. We are, thus, bound to adhere to the *Friends of "B" Street* standard in reviewing, in our turn,[9] the Board's decision.

Applying this standard, we find substantial evidence of record, on the basis of which one might fairly argue that the ordinance amendment may have a significant effect on the environment. This evidence appears in the text of the ordinance amendment itself, in the Santa Clara County General Plan, which the Board had adopted on November 18, 1981, and in the administrative record which appellants filed in the trial court on September 2, 1983.[10]

The ordinance amendment itself contemplates possible adverse environmental impacts, in that it prescribes steps to be taken "[¶][i]n case of any failure, malfunction or breakdown of any private sewage system . . . ." These steps include forced "vacation of the premises if no other [means] of abatement is possible."

The history of conventional septic tank use in Santa Clara County, as revealed in the county's general plan, is one of environmental degradation, both through outright failures of systems (p. K6) and through mere "over concentrations of septic systems" (p. D8). Specific sites of contamination

---

[9]"This court and the trial court occupy identical positions with respect to review of the Board's decision in this case." (*Merz* v. *Board of Supervisors* (1983) 147 Cal.App.3d 933, 938 [195 Cal.Rptr. 370].)

We note that Guidelines, section 15070 was designated effective August 1, 1983, and that section 21080, subdivision (c), was part of an urgency measure which became effective September 16, 1983. (Stats. 1983, ch. 872, § 6; Cal. Const., art. IV, § 8, subd. (c)(2).) The trial court was, therefore, when it conducted its hearing on October 31, 1983, as much bound by these measures as we are.

[10]We do not discuss the deposition testimony of Kenneth Reiller, an engineer for the Santa Clara Valley Water District. Reiller was deposed October 12, 1983, months after the Board adopted the ordinance amendment. Since Reiller's testimony was not before the Board at the time the Board acted on the ordinance amendment, this testimony should have played no part in the trial court's review of the Board's action, and plays no part in our review. (*Brentwood Assn. for No Drilling, Inc.* v. *City of Los Angeles, supra,* 134 Cal.App.3d 491, 502-503.)

include "the aquifers beneath the north and south valleys" (cf. Guidelines, appen. G, subds. (f), (h))[11] and an extension of Lexington Reservoir (cf. Guidelines, appen. G, subds. (f), (g)) which was "polluted to an extent noticeable by both sight and smell."

In response to an inquiry about the then-proposed ordinance amendment, a senior engineer of the California Regional Water Quality Control Board pointed out, in a letter dated January 11, 1983, that alternative sewage disposal systems are notorious for their failure. By memorandum dated April 13, 1983, the Santa Clara County Health Department "recommended that the Board of Supervisors not adopt this alternative sewage ordinance due to the unproven nature of proposed alternative systems." This memorandum opined that installation of alternative systems would result "in an increased possibility of system failure with possible public health consequences requiring abatement." (Cf. Guidelines, appen. G, subd. (v).)

The negative declaration which the Board adopted at the time it passed the ordinance amendment noted that opening up areas previously closed to development because unsuitable for conventional septic tank systems "would appear to have a growth inducing potential." (Cf. Guidelines, appen. G, subd. (k).)

We conclude that the Board acted in violation of CEQA in ignoring or discounting this considerable body of evidence, and that the trial court acted properly in granting respondent's petition for a writ of mandate.

*But . . .*

Our conclusion that the ordinance amendment is a "project" is made with reluctance, and not with the ease which our acceptance of appellants' concession in that regard may suggest. The very broad definition of "project" which *Bozung* dictates compels us to this conclusion.

Working from the premise that "it is desirable that the precise information concerning environmental consequences which an EIR affords be furnished

---

[11]Guidelines, appendix G provides, in relevant part:
"A project will normally have a significant effect on the environment if it will:
" . . . . . . . . . . . . . .
"(f) Substantially degrade water quality;
"(g) Contaminate a public water supply;
"(h) Substantially degrade or deplete ground water resources;
" . . . . . . . . . . . . . .
"(k) Induce substantial growth or concentration of population;
" . . . . . . . . . . . . . .
"(v) Create a potential public health hazard or involve the use, production or disposal of materials which pose a hazard to people or animal or plant populations in the area affected;
" . . . . . . . . . . . . . ."

and considered at the earliest possible stage" (*Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d 263, 282), the *Bozung* court holds that a local agency formation commission's approval of an annexation proposal, which could lead to enactment of an ordinance of annexation, which could lead to rezoning, which could lead to issuance of use, building, and grading permits, which could lead in turn to actual construction of houses, is a "project" within the meaning of section 21151, so that an EIR must precede such approval. Requiring an EIR "at the earliest possible stage" in *Bozung* did not lead to as absurd a result as we experience in this case. In *Bozung,* each step in the string of possibilities was aimed at facilitating an existing plan to subdivide and develop a 677-acre ranch. The required EIR obviously would deal with the effects to be anticipated from implementation of that plan.

In this case, the "earliest possible stage" obviously is now, but the only plan of which we are aware is that of one landowner who is apparently willing to shoulder the burdens of installing and maintaining an alternative sewage disposal system. No EIR would be required for implementation of that plan by itself, which proposes a system to handle wastewater produced by a two-bedroom house. (Guidelines, § 15303.) An EIR is required in this case, only because of a potential for other alternative sewage disposal proposals for other sites in the future.

This case illustrates how, with some well-directed legal effort, an opponent of development can delay or, sometimes, abort a project. The expense of delay, and the expense of an EIR itself, can force cancellation of plans having little or no environmental impact. This case also illustrates how easily courts can, or must, cause that result even when the substance of the required EIR must be speculative and conjectural, its geographic scope huge, its cost staggering, and its ultimate utility highly questionable, at best.

Due to the unspecified nature of future proposals for alternative sewage disposal systems, the preparer of an EIR in this case would be obliged, among other things, to review "all available literature" on the various types of alternative sewage disposal systems available and their performance in varying climactic and soil conditions, to do a county-wide study to determine the areas not served by sewers and the soil conditions therein, a study of past problems with sewage pollution, a study of possible future population densities, and a study of potential for future pollution problems and attendant public health hazards.[12] We do not deal with a specific plan for development

---

[12]This partial list of EIR contents is based on respondent's answer to a question propounded by the court, asking what facts an EIR prepared in this case would appropriately contain.

of 677 acres, as did *Bozung*. We deal here with a potential for many different plans, involving different systems, in different places, in a county covering 1,300 square miles of varied topography and soil conditions. If we assume that someone is willing to undertake the cost of such a report (and the county seems the only candidate for paying the bill), there is no assurance that the report will be useful to anyone. After an EIR is prepared, if the Board chooses to order one, and by the time another ordinance amendment is enacted, the one known applicant may well have lost interest and others may not materialize. The invitation will be out to other property owners, after great public expense and after considerable delay, but will anyone come to the party?

Expenditure of limited governmental resources on speculative studies is contrary to sound policy and contrary to the legislative intent in enacting CEQA, as we perceive them. The route which the Board followed in this case, adoption of a negative declaration, avoided such foolishness and was suitable to the facts which the Board faced. Nevertheless, we are bound by the pronouncements of the California Supreme Court as to what constitutes sound policy and as to what prompted the Legislature to enact CEQA. We follow those pronouncements.[13]

### *The Award of Attorney's Fees**

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

The judgment is affirmed and the postjudgment order granting attorney's fees is affirmed.

Elkington, Acting P. J., concurred.

**NEWSOM, J.,** Concurring.—I concur in what I conceive to be the clear holding of the majority that the Santa Clara Board of Supervisors acted illegally in adopting a negative declaration for the proposed sewage disposal system.

I write this separate concurrence, however, because I wish to disassociate myself from the conclusions—all of them dicta, I believe—stated on page

---

[13]It is implicit in these pronouncements and the holding of this opinion, that a narrowly drawn ordinance, significantly limiting the number, type, and location of alternative sewage disposal systems which may be installed in Santa Clara County, should not face the problems of the ordinance amendment. An EIR prepared in connection with the enactment of such an ordinance would be manageable in scope and minimally speculative. It should offer real assistance in protecting the environment and serve a real function in informing the Board and the public.

*See footnote, *ante*, page 601.

609, beginning with the word "But" and continuing to the end of the published part of the majority opinion.

Thus, I find nothing "absurd" in the view that pouring septic effluents into a leach field near a public reservoir should constitute a "project" under applicable law, if only because, as the majority opinion puts it, "the history of conventional septic tank use in Santa Clara . . . is one of environmental degradation." And, indeed, as the majority further notes, the Santa Clara Board *itself* recognized the "growth inducing potential" of the system proposed in the present case.

As this court said in an almost identical context, "[w]e of course recognize that it is presently impossible to determine with specificity the number, nature or location of replacement construction projects. Until such projects are proposed, their impact—individually and in the aggregate—cannot be gauged with exactitude. But that the ordinance reasonably portends possible future environmental impacts flowing from the cumulative effect of probable replacement construction projects seems undeniable. And even before specific projects are commenced the City may be able to state—at least in general terms—that the ordinance will have an impact upon the environment, or to dismiss that possibility. Without a threshold evaluation, however, the City leaves its constituents in ignorance of the avoidable dangers CEQA intended to avert. If a 'project' poses the possibility of significantly influencing the environment, as the subject ordinance clearly seems to do, the inability of the City to identify impacts ought not to relieve it of the responsibility to prepare an appropriate EIR in accordance with section 21151." *Terminal Plaza Corp.* v. *City and County of San Francisco* (1986) 177 Cal.App.3d 892, 904-905 [223 Cal.Rptr. 379].)

I wish also to state my entire disagreement with the majority's view that this case serves to illustrate "how an opponent of development can delay, or, sometimes, abort a project." To my mind, it serves rather to illustrate the wisdom of a law which permits citizens vigilant in the public interest to force local government to think before it acts.

Appellants' petition for review by the Supreme Court was denied January 29, 1987.