[Civ. No. 20002. Third Dist. Aug. 26, 1982.]

ENVIRONMENTAL COUNCIL OF SACRAMENTO, Plaintiff and Appellant, v.
BOARD OF SUPERVISORS OF SACRAMENTO COUNTY, Defendant and Respondent;
ERNEST EHNISZ et al., Real Parties in Interest and Respondents.

COUNSEL

Michael H. Remy and Tina A. Thomas for Plaintiff and Appellant.

Thomas F. Olson, Lilian S. Shek and Theodore A. Cobb as Amici Curiae on behalf of Plaintiff and Appellant.

L. B. Elam, County Counsel, and R. S. Willett, Deputy County Counsel, for Defendant and Respondent.

Hefner, Stark & Marois and Timothy D. Taron for Real Parties in Interest and Respondents.

OPINION

**PUGLIA, P. J.**—The primary question in this appeal is whether respondent Sacramento County Board of Supervisors (Board), in amending its general plan, has complied with the California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.)[1] and administrative guidelines (Cal. Admin. Code, tit. 14, § 15000 et seq.). As we conclude that it has not, we shall reverse the judgment of the superior court.

Real parties in interest, Ernest and Naomi Ehnisz, are the record owners of the real property which is the subject of the present litigation. In 1978, the Ehniszes' predecessor in interest filed applications with Sacramento County (County) (1) to amend the general plan land use designation of the subject property from "permanent agricultural" to a residential use and (2) to subdivide this approximately 740 acres of land into 37 parcels of 20 acres each.

Following the preparation and public circulation of an environmental impact report (EIR) identifying the proposed project with a loss of productive agricultural land and significant growth-inducing impacts, the county policy planning commission heard and denied the respective applications. On appeal therefrom, the Board found that the EIR was adequate and complete with the finding that the project, if developed, would have a significant adverse impact on the environment. Accord-

---

[1]Unless otherwise indicated, all subsequent statutory references are to sections of the Public Resources Code.

ingly, the Board denied the tentative subdivision map but continued the general plan amendment for further consideration.

Meanwhile, the Ehniszes filed an application to amend the previous applications of their predecessor in interest. The amendment provided for approximately 190 acres to be subdivided into a residential development of 38 five-acre lots; the remaining acreage would remain limited to permanent agricultural use. This new proposal required a change in the general plan land-use designation of only the 190 acres from "permanent agricultural" to "agricultural-residential."

Because of the amended application, a supplemental EIR was prepared and circulated to the public. The environmental effects identified with the original proposal were summarized in the supplemental EIR as follows: "Elimination of the present and potential agricultural use of the site by division into non-viable agricultural units would be contrary to adopted General Plan policies. Approval of the project could be construed as a precedent for allowing subdivision of adjacent large parcels of about 2,000 acres not now in protective Williamson Land contracts. This growth inducement would further limit agriculture pursuits in the area and has the potential for adversely affecting the provision of public services. Of concern in the provision of public services are police protection; fire protection (as particularly affected by the lack of a centralized water supply system); and the provision of public schools. The possible cumulative effects of the project in this regard have been judged to be significantly adverse." The supplemental EIR then discussed the environmental impacts of the changed proposal as follows: "The major changes in the proposal have been to limit subdivision of the site to 191 of the 716 acres ... and to increase the density of development from 1 dwelling unit per 20 acres to 1 dwelling unit per 5 acres on the subdivided portion. These changes would reduce the direct effect of immediately eliminating the productive agricultural use of the site by division into uneconomic units, but may intensify the indirect effects associated with growth inducement attributed to the former proposal in the Final EIR. The increase in density suggested for the subdivided portion of the site would permit approximately the same number of lots as originally proposed ... therefore resulting in identical impacts upon services affected by a new residential population. Discussion in the Final EIR regarding impacts upon police and fire protection, and public schools would apply to the new proposal. Discussion in the Final EIR regarding contribution to declining ground water levels would apply to the new proposal, but the magnitude of the secondary impact could be greatly

increased if additional growth were induced at the density now proposed. It was suggested in the Final EIR that soils in this area were not considered best for septic system operation, but that the proposed 20 acre parcels would provide sufficient area such that a combination of methods could provide adequate sewage disposal. The increased density of the project increases the likelihood that some lots may be found unsuitable or difficult to maintain septic systems on." In conclusion, the supplemental EIR stated: "It is the opinion of the preparers ... that the environmental effects of the revised project discussed here have not substantially reduced those assigned to the original proposal, and that the *potential* effects of the project are significantly adverse." (Italics ours.) After listing the mitigation measure identified with the original proposal, the supplemental EIR added a measure of requiring the property owner to place the remaining acres into a Williamson Land Act preserve prior to any subdivision of the smaller portion.

At a hearing on the matter, the policy planning commission accepted the supplemental EIR as adequate and complete and denied the general plan amendment and tentative subdivision map. Its stated reasons for denial were: (1) the supplemental "EIR ... finding potential adverse effects"; (2) the "[p]ossible growth inducing effects of the project"; (3) "[d]uring zoning consistency hearings the Commission had placed the property in permanent agriculture, taking this property in context with all others in the area"; and (4) "[u]nwillingness on the part of the Commission to place more land in the Agricultural-Residential land use category where excess Agricultural Residential lands now exist in the County ...."

The Ehniszes appealed to the Board from the decision of the policy planning commission denying the general plan amendment. Denial of the tentative subdivision map was not appealed. After a hearing, the Board on June 21, 1979, (1) certified the supplemental EIR as adequate and complete, along with the EIR's conclusions of potential significant adverse environmental effects; (2) granted the appeal with a finding of "overriding concerns;" and (3) referred the matter to the staff for preparation of formal findings.

In a report back to the Board, planning staff found no evidence of overriding concerns and recommended that the Board either deny the project or, after reconsidering the EIR findings of significant adverse effects and if satisfied such overall impacts can be reduced to "less than

significant," certify the supplemental EIR with such a finding and approve the project.

Following the staff recommendation, the Board at a hearing on October 25, 1979, rescinded its previous determination that the final EIR and supplement thereto were adequate and complete, including the finding in the supplemental EIR of potential significant adverse effects. The Board then reopened the hearing but no new evidence was presented. At the conclusion of the hearing, the Board *re*certified the supplemental EIR as adequate and complete with a changed finding that the impacts identified therein were "less than significant." It then approved the general plan amendment which reclassified the 190 acres of the subject property from permanent agricultural to agricultural-residential. Approval was conditional on the Ehniszes' placing the remaining acres of their property into a Williamson Land Act preserve, which would assure that these remaining acres would be used only for agricultural purposes during the next 20 years. On November 1, 1979, the Board adopted a final resolution on the matter.

Plaintiff Environmental Council of Sacramento then filed the underlying petition for a writ of mandamus to compel the Board to vacate its decision amending the general plan. The superior court entered judgment denying the writ of mandate from which plaintiff appeals.

Plaintiff and organizations appearing as amici curiae challenge the Board action amending the general plan as (1) failing to comply with the requirements of CEQA, (2) inconsistent with the long-term goals of the county's general plan (Gov. Code, § 65300.5), and (3) contrary to the public interest (Gov. Code, § 65356.1). We conclude that the Board failed to comply fully with CEQA and accompanying guidelines.

I

In a lawsuit charging noncompliance with CEQA, judicial inquiry is limited to the question of abuse of discretion, which is established if the Board has not proceeded as required by law or if its determination, finding or decision is not supported by substantial evidence. (§§ 21168, 21168.5; *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66]; *Whitman* v. *Board of Supervisors* (1979) 88 Cal.App.3d 397, 405 [151 Cal.Rptr. 866].) We apply that standard here.

■ With regard to CEQA compliance, plaintiff first argues that the Board's June 21, 1979, certification of the supplemental EIR with a finding of potential significant adverse environmental effects was a final decision which the Board had no jurisdiction to reconsider.

The Board did not take final action on the general plan amendment until it approved the plan. The guidelines to CEQA define "approval" as ". . . the decision by a public agency which commits the agency to a definite course of action in regard to a project intended to be carried out by any person. The exact date of approval of any project is a matter determined by each public agency according to its rules, regulations, and ordinances. Legislative action in regard to a project often constitutes approval. . . ." (Cal. Admin. Code, tit. 14, § 15021.) Here, the Board was not committed to the general plan amendment until it was legislatively approved by resolution on November 1, 1979.

Were we to hold otherwise, the Board would be powerless to reopen the CEQA review process after certifying an EIR as complying with CEQA even if new evidence or information came to the Board's attention revealing that environmental impacts were not adequately discussed in the previously certified EIR. (See *Sutter Sensible Planning, Inc.* v. *Board of Supervisors* (1981) 122 Cal.App.3d 813, 821-822 [176 Cal.Rptr. 342]; *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist.* (1972) 27 Cal.App.3d 695, 708-709 [104 Cal.Rptr. 197]; 60 Ops.Atty.Gen. 335, 339-343 (1977).) Such a result clearly was not the intent of the Legislature in enacting CEQA, as there are specific provisions in CEQA *requiring* the preparation of subsequent and supplemental EIR's when new information which could not previously have been known comes to light or changed conditions occur. (§ 21166; Cal. Admin. Code, tit. 14, §§ 15067, 15067.5.)

Plaintiff also argues the Board violated CEQA by changing the environmental conclusion of the supplemental EIR prepared by staff to "less than significant." The argument as we perceive it has three aspects: (1) the power of the Board to change findings prepared by staff, (2) necessity of recirculating the altered document, and (3) the necessity of the Board to make further findings.

■ (1) As ultimate decision-maker, the Board had the *power* to change the findings in the EIR prepared by its staff. The preparation of

an EIR is a CEQA responsibility which may but does not have to be delegated to staff. (Cal. Admin. Code, tit. 14, § 15055, subd. (3).) Only when the decision-making body of a public agency certifies as adequate and complete an EIR prepared by staff does it adopt the findings of the preparers. (See Cal. Admin. Code, tit. 14, § 15085, subd. (g); *Cleary* v. *County of Stanislaus* (1981) 118 Cal.App.3d 348, 362 [173 Cal.Rptr. 390].) Here, the Board rescinded its prior certification of the staff-prepared EIR and was thus at liberty to change the environmental conclusion. None of the criteria under CEQA guidelines *mandating* a finding of "significant effect on the environment" was present. (See Cal. Admin. Code, tit. 14, § 15082.)

■ (2) That the Board reached an environmental conclusion different from that of its staff did not vitiate the process of review, public comment, and consultation required under CEQA. The draft EIR prepared by staff on the general plan amendment was circulated, comments were received, and final and supplemental EIR's were prepared and circulated. The public, including plaintiff and amici curiae, were never denied an opportunity to provide relevant evidence and information. The hearings of the Board on June 21 and October 25, 1979, were noticed and open to the public. No new evidence which could have affected the substance of the final or supplemental EIR's was presented at the October 25 hearing. The only change at the time was in the Board's ultimate conclusion, which, as we have indicated, was within its power to effect. CEQA requires the preparation of a subsequent or supplemental EIR, with the same notice and public review accorded draft EIR's, only where: "(a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report.

"(b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report.

"(c) New information, which was not known and could not have been known at the time of the environmental impact report was certified as complete, becomes available." (§ 21166; Cal. Admin. Code, tit. 14, §§ 15067, 15067.5, particularly subd. (c); see also *Sutter Sensible Planning, Inc.* v. *Board of Supervisors, supra*, 122 Cal.App.3d at pp. 821-823.)

■ (3) However, the Board did fail to proceed in a manner required by law when, without further complementary findings, it substituted its own conclusion that the overall environmental impacts identified in the EIR were less than significant. Although the Board had the power to assess overall environmental significance, the supplemental EIR it certified as adequate and complete nonetheless identified and discussed several significant growth-inducing impacts associated with the revised proposal which were identical to or greater than those associated with the original plan. The Board necessarily adopted this staff analysis of environmental effects when it adopted the supplemental EIR, albeit with a changed conclusion. (See *Cleary* v. *County of Stanislaus, supra*, 118 Cal.App.3d at p. 362.) Section 21081 prohibits a public agency from approving or carrying out a project for which an EIR identifying one or more significant effects has been completed without a finding relative to mitigation.[2] (See also Cal. Admin. Code, tit. 14, §§ 15088, 15089; *Cleary*, at pp. 360-362.) Hence, the Board was required to make one or more of the findings set forth in section 21081 before it could approve the general plan amendment. (*Cleary*, at p. 362.)

## II

■ Plaintiff and amici also maintain that the general plan amendment redesignating the 190-acre parcel from permanent agricultural to agricultural-residential is internally inconsistent with the long-term goals of the general plan. They rely for authority on Government Code section 65300.5, which provides: ". . . the Legislature intends that the general plan and elements and parts thereof comprise an integrated, internally consistent and compatible statement of policies for the adopting agency."

■ As the general plan amendment was a legislative act, our review of such a claim focuses on whether the Board acted arbitrarily, capri-

---

[2]Section 21081 provides in full: "Pursuant to the policy stated in Sections 21002 and 21002.1, no public agency shall approve or carry out a project for which an environmental impact report has been completed which identifies one or more significant effects thereof unless such public agency makes one, or more, of the following findings: [¶] (2) Changes or alterations have been required in, or incorporated into, such project which mitigate or avoid the significant environmental effects thereof as identified in the completed environmental impact report. [¶] (b) Such changes or alterations are within the responsibility and jurisdiction of another public agency and such changes have been adopted by such other agency, or can and should be adopted by such other agency. [¶] (c) Specific economic, social, or other considerations make infeasible the mitigation measures or project alternatives identified in the environmental impact report."

ciously, or without any evidentiary basis. (*Karlson* v. *City of Camarillo* (1980) 100 Cal.App.3d 789, 800-801 [161 Cal.Rptr. 260]; see also generally *Arnel Development Co.* v. *City of Costa Mesa* (1980) 28 Cal.3d 511 [169 Cal.Rptr. 904, 620 P.2d 565].) ▮ While it may be true that the Sacramento County general plan expresses general policies of maintaining and enhancing the agricultural environment by minimizing urban expansion in directions which would conflict with agricultural pursuits, and that the policy planning staff has consistently opposed the agricultural-residential use of the property in question, it does not necessarily follow that the Board's decision reclassifying the property from agricultural to agricultural-residential is inconsistent with the broad policy expressed in the general plan to maintain agricultural lands. "Obviously, the fact that the Legislature provided for amendments of a general plan indicates that it recognized the need for review, updating and correcting." (*Karlson, supra,* 100 Cal.App.3d at p. 801; see also *Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 118 [109 Cal.Rptr. 799, 514 P.2d 111].) We cannot say as a matter of law that the Board acted arbitrarily or capriciously in its legislative capacity.

### III

Plaintiff's final contention is that the general plan amendment is defective because it is not in the public interest. Government Code section 65356.1 provides: "When it deems it to be in the public interest, the legislative body may change or add to all or a part of an adopted general plan. . . ."

Once again, as to this legislative change, our judicial review of whether the Board acted in the public interest is limited to whether its action has been arbitrary, capricious, or entirely lacking in evidentiary support. (*City of Rancho Palos Verdes* v. *City Council* (1976) 59 Cal. App.3d 869, 891 [129 Cal.Rptr. 173].) Here, we will not probe into the relative merits of what is or is not in the public interest absent a more compelling showing in the evidentiary record that the general plan amendment served *no* public purpose. We leave that decision to the discretion of the Board as the locally elected legislative body.

The judgment is reversed and the matter remanded to the trial court with instructions to issue a writ of mandate directing the Sacramento County Board of Supervisors to supply written findings pursuant to sec-

tion 21081 and California Administrative Code, title 14, sections 15088 and 15089.[3]

Carr, J., and Sparks, J., concurred.

---

[3]Unlike *No Oil, Inc. v. City of Los Angeles, supra*, 13 Cal.3d at page 81, this is not a case where a public agency has totally failed to render any environmental findings regarding a project and has totally ignored the information-gathering requirements of CEQA. Rather, the public agency has acted properly in completing and certifying as an adequate information document a final EIR, but has failed to make additional findings, in the face of significant environmental impacts identified in the EIR, to justify its decision to approve the project. Accordingly, we deem.remand appropriate at this final stage of the CEQA process.