[No. D003018. Fourth Dist., Div. One. Aug. 8, 1986.]

CHRISTWARD MINISTRY, Plaintiff and Appellant, v.
THE SUPERIOR COURT OF SAN DIEGO COUNTY,
Defendant and Respondent;
CITY OF SAN MARCOS et al.,
Real Parties in Interest and Respondents.

**COUNSEL**

Michael M. Hogan and Gray, Cary, Ames & Frye for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

Warren B. Diven and F. MacKenzie Brown for Real Parties in Interest and Respondents.

Smith & Peltzer, Wesley W. Peltzer, Nossaman, Guthner, Know & Elliott and John Knox as Amici Curiae on behalf of Real Parties in Interest and Respondents.

**OPINION**

**STANIFORTH, Acting P. J.**—Christward Ministry (Christward) appeals the denial of its petition for a writ of mandate to set aside the adoption of a general plan amendment creating a solid waste management facilities designation and applying it to the San Marcos landfill without an environmental impact report (EIR) by the City of San Marcos (City).

## FACTS

The City has eight separate planning areas including the 4000-acre South City planning area involved here. Christward owns 640 acres in the South City area which it uses as a religious retreat. Also within the South City area is the 202-acre San Marcos sanitary landfill. The landfill has been operated continuously since 1977 when the City approved an environmental impact report and special use permit for the landfill.

In 1984, the City's staff proposed an amendment to the general plan (GPA 02-84) in response to legislation requiring local planning agencies to identify solid waste facility sites and to adopt guidelines for avoiding potential conflicts between solid waste facilities and surrounding land uses. The amendment proposed a solid waste management facilities plan designation for the South City area and applied the designation specifically to the San Marcos landfill. The amendment also contained guidelines for siting and approving new or expanded solid waste management facilities based on guidelines recently adopted by Fresno and Kern Counties.

The City planning department conducted an initial study of the impact of the amendment and concluded since the amendment would not create any new impacts not already adequately addressed by the 1977 environmental impact report (EIR) for the San Marcos landfill, it did not need to prepare an EIR but only a negative declaration.

In July 1984, following a public hearing attended by Christward, the City planning commission approved the amendment. Christward appealed the decision to the City council.

On August 28, 1984, the City council voted four to zero to approve the amendment and adopt the negative declaration.

Christward filed a petition for a writ of mandate in superior court contending the City was required to prepare an EIR before adopting the amendment. The court denied the petition on the grounds the amendment was required by state law and did not authorize any new solid waste management use not previously authorized by the City's general plan and zoning ordinances, therefore an EIR was not required. Upon denial of its petition, Christward sought a writ of mandate in this court (D002848). We denied the petition on April 5, 1985, finding Christward's remedy of appeal was adequate. Christward thereafter filed its notice of appeal on April 15, 1985.

## DISCUSSION

### I

The California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) was enacted by the Legislature to "[e]nsure . . . long-term protection of the environment . . . ." (Pub. Resources Code, § 21001, subd. (d).) **(1)** "CEQA is essentially an environmental full disclosure statute, and the EIR is the method . . . [of] disclosure . . . ." (*Rural Landowners Assn.* v. *City Council* (1983) 143 Cal.App.3d 1013, 1020 [192 Cal.Rptr. 325].) An EIR functions "to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment . . . ." (Pub. Resources Code, § 21061; *Karlson* v. *City of Camarillo* (1980) 100 Cal.App.3d 789, 804 [161 Cal.Rptr. 260]; *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist.* (1972) 27 Cal.App.3d 695, 704-705 [104 Cal.Rptr. 197].) An EIR is "an environmental 'alarm bell' whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return" (*County of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377]) and "to demonstrate to an apprehensive citizenry that the agency has in fact analyzed and considered the ecological implications of its action" (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 86 [118 Cal.Rptr. 34, 529 P.2d 66]). ■ An EIR is required for any project where it may be fairly argued a project will have a significant impact on the environment. (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, 75; Pub. Resources Code, § 21151.) If there is a possibility the project may have such an effect, the local agency must conduct an initial threshold study. (Cal. Admin. Code, tit. 14, § 15080; *Merz* v. *Board of Supervisors* (1983) 147 Cal.App.3d 933, 936 [195 Cal.Rptr. 370].) If there is no substantial evidence to support a fair argument the project will have a significant effect on the environment, then the local agency is to adopt a negative declaration. (Pub. Resources Code, § 21080, subd. (c)(1); *Newberry Springs Water Assn.* v. *County of San Bernardino* (1984) 150 Cal.App.3d 740, 748 [198 Cal.Rptr. 100]; Selmi, *The Judicial Development of the California Environmental Quality Act* (1984) 18 U.C.Davis L.Rev. 197, 228.)

■ An amendment to a general plan applying a land use designation falls within the scope of CEQA and an EIR or negative declaration is required as an adjunct to approval. (*City of Santa Ana* v. *City of Garden Grove* (1979) 100 Cal.App.3d 521, 534 [160 Cal.Rptr. 907]; Cal. Admin. Code, tit. 14, § 15378, subd. (a)(1).) In assessing the impact of the amendment, the local agency must examine the potential impact of the amendment on the existing physical environment; a comparison between the proposed amendment and

the existing general plan is insufficient. (*Environmental Planning & Information Council* v. *County of El Dorado* (1982) 131 Cal.App.3d 350, 358 [182 Cal.Rptr. 317].)

Section 21168 of the Public Resources Code provides for judicial review of an agency decision under CEQA which was made after a hearing by the administrative mandamus procedure of Code of Civil Procedure section 1094.5. ■ Judicial review focuses on whether there is any substantial evidence in light of the whole record to support the decision and whether the agency abused its discretion by a filing to proceed in the manner required by law. (*Citizens to Preserve the Ojai* v. *County of Ventura* (1985) 176 Cal.App.3d 421, 428 [222 Cal.Rptr. 247]; *Dehne* v. *County of Santa Clara* (1981) 115 Cal.App.3d 827, 835 [171 Cal.Rptr. 753].)

■ On a claim an EIR rather than a negative declaration should have been prepared, the courts look to see if there was substantial evidence to support the agency's conclusion it could not be "fairly argued" the project would have a significant environmental impact. (*Brentwood Assn. for No Drilling, Inc.* v. *City of Los Angeles* (1982) 134 Cal.App.3d 491, 503-504 [184 Cal.Rptr. 664].) If there is no substantial evidence to support the agency's conclusion a fair argument cannot be made that the project will have a significant environmental impact, then the agency's action in adopting a negative declaration amounts to an abuse of discretion by the agency and a failure to proceed in a manner required by law. (*Ibid.*)

## II

The general plan amendment here (GPA 02-84) states its purpose is to guide the location and designation of solid waste management facilities within the South City planning area. The amendment's objectives are stated as: (1) ensuring "proper siting of solid waste management facilities" in the area, (2) protecting "existing and future solid waste management facilities from encroachment from incompatible land uses" and (3) designating "the San Marcos Sanitary Landfill as a solid waste management facility and site on the City's General Plan Land Use Map."

The amendment contains seven policies: "1. New solid waste management facilities shall be located in areas where environmental impacts can be minimized and are determined to be compatible with the surrounding land uses.

"2. Land use compatibility with existing and planned new uses or facilities shall be ensured through the imposition of conditions dealing with site location and development and the issuance of a use permit by the City.

"3. Adjoining land uses and zoning shall be deemed compatible by virtue of the zoning classifications and land use designations which indicated that the surrounding properties are or designated for Estate Residential and Agricultural densities and land uses as set forth in the City's and County General Plan.

"4. Solid waste management facilities shall be site designed with the following features to ensure land use compatibility with surrounding properties: provide adequate setbacks between the solid waste management operations and surrounding properties, particular emphasis on residential properties and structures shall be given, to reduce or eliminate potential noise, dust, odor and vector conditions; install and maintain a landscaped buffer around the perimeter of the solid waste operations with emphasis on planting of strategic locations between the operations and residential units as a visual screen enhancing on-site views or eliminating negative visual features of solid waste management facilities; utilize natural topographic features to strategically locate such facilities to diminish visibility and to reduce potential noise problems.

"5. Solid waste management operations shall be mitigated at the time of consideration of a use permit by the City. Such use permit consideration shall address, at a minimum, the following conditions to protect such operations and to ensure land use compatibility with surrounding properties: potential litter problems and removal programs at and around the facility operation(s); potential dust problems in areas where fugitive dust conditions are created by operational activities; potential odor and vector problems; potential traffic problems associated with vehicles utilized by the operations or in conjunction with the existing or planned solid waste management operations; potential noise and visual problems associated with existing or planned solid waste management operations or facilities at this site.

"6. Incompatible land uses shall not be permitted within an identified impact area of existing or planned solid waste facilities and/or operations.

"7. The following land uses are deemed consistent with the solid waste management land use designation and policies: sanitary landfills, transfer stations, waste-to-energy facilities, recycling and resource recovery centers. Hazardous solid or liquid waste disposal operations shall not be allowed within this land use category."

The City's intent in adopting a GPA 02-84 is reflected in the City's resolution 84-2005. This resolution states the amendment was necessary to comply with state law requirements about designating the general location and extent of waste disposal facilities (see Gov. Code, §§ 65302, subd. (a),

66730 et seq.) and ensuring surrounding land uses were compatible. (See, e.g., Gov. Code, § 66796.41.) Before the resolution, the City's general plan lacked such a designation and guidelines; solid waste management use was permitted on nonresidential land in the City through a special use permit.

The resolution also states the amendment's purpose was to apply a solid waste management facility land use designation to the San Marcos landfill, to establish land use policies to "guide any future development, expansion or modification of the existing San Marcos Landfill Site" and to establish standards to "govern the City's consideration of future solid waste disposal development proposals at the San Marcos Landfill Site."

## III

■ Christward contends an EIR was required because the amendment's "effect [was] to change the land use designation of the entire Community Plan Area to permit the future siting of new and expanded types of solid waste management facilities." This assertion is not born out by the language of the amendment.

While the amendment addresses the siting of "new" or "future" solid waste management facilities in the general South City planning area, the amendment actually applies the land use designation only to the 202-acre San Marcos landfill. No other area in South City is designated as a solid waste management facility site by the amendment. Only the San Marcos landfill is given such a designation. Only the San Marcos landfill area of the City's general plan land use map is authorized to have a solid waste management facility designation by the amendment. To apply the solid waste management facility designation to any other part of the South City planning area would require another general plan amendment. To the extent Christward's claims rest on a change of land use designation on the 4,000 acres of South City, there is no merit.

## IV

■ Christward argues an EIR was required because the amendment authorized an expansion of land uses at the San Marcos landfill. It points to policy 7 of the amendment which states: *"The following land uses are deemed consistent with the solid waste management land use designation and policies: sanitary landfills, transfer stations, waste-to-energy facilities, recycling and resource recovery centers. Hazardous solid or liquid waste disposal operations shall not be allowed within this land use category."* (Italics added.)

The City asserts that at the time the amendment was adopted, the City's general plan and zoning ordinances permitted these uses by a use permit in all nonresidential areas of the City and the effect of applying the solid waste management facilities designation to the San Marcos landfill was merely a ratification of an existing use which had an adequate EIR completed and adopted in 1977.

However, the amendment's definition of a solid waste management facility designation includes uses which did not exist at the landfill site at the time the amendment was adopted, e.g., transfer stations, and waste-to-energy facilities. The amendment does not, as City contends, merely ratify an existing use for which an EIR had been prepared in the past, but authorizes potential new uses at the site.

■ When assessing whether an EIR is required for a general plan amendment changing a land use designation, the local agency is required to compare the newly authorized land use with the actually existing conditions; comparison of potential impacts under the amendment with potential impacts under the existing general plan is insufficient. ■ In *Environmental Planning & Information Council* v. *County of El Dorado, supra,* 131 Cal.App.3d 350, the city had adopted general plan amendments reducing the residential population densities in two areas of the city. The city's EIR compared the potential population densities allowed under the existing general plan (70,400 and 63,600) with the population densities allowed under the amendment (5,800 and 22,440). The appellate court held the EIR was inadequate because it failed to examine the impact of the amendment on the actual physical environment. The court noted the comparisons were "illusory" since the actual populations of the two areas were 418 and 3,800; the amendments actually called for substantial increases in population rather than illusory decreases. (*Id.,* at p. 358.) The court concluded: "The comparisons utilized in the EIRs can only mislead the public as to the reality of the impacts and subvert full consideration of the actual environmental impacts which would result. There are no extensive, detailed evaluations of the impacts of the proposed plans on the environment in its current state. Accordingly, the EIRs fail as informative documents." (*Ibid.*)

Similarly, in the instant case, the City's argument that the amendment had no significant environmental impact because under the existing general plan such facilities could have been located at the San Marcos Landfill site by a special use permit, must fail. At the time of the amendment, the hypothetically permitted facilities did not in fact exist at the landfill. As in *Environmental Planning & Information Council* v. *County of El Dorado, supra,* 131 Cal.App.3d 350, an environmental analysis based on a com-

parison between what was possible under the existing general plan and what was permitted under the amendment was "illusory."

Moreover, as represented by the City, under the existing general plan such facilities were not tied to any particular location, but rather were permitted, upon obtaining the necessary permit, in all but residential areas. In contrast, the effect of the amendment was to pinpoint a particular location for these facilities and apparently, to concentrate them. Thus, even if a mere comparison between the existing general plan and the amendment were sufficient, in the instant case, it was like comparing apples and oranges.

Further, the City's reliance on a comparison with the existing general plan is misplaced in light of one of the stated reasons for enacting the amendment—the need to conform to state law requiring the City to develop guidelines for siting solid waste facilities and to apply such a designation before approving such facilities.

Under the Nejedly-Z'berg-Dills Solid Waste Management and Resource Recovery Act of 1972 (Act) (Gov. Code, § 66701 et seq.) as amended in 1983, local governments are directed to develop a solid waste management plan. (Gov. Code, § 66780, subd. (a).) The plan must "[i]dentify and reserve sites for the establishment or expansion of solid waste facilities" and "[e]nsure that land uses adjacent to or near those sites are compatible with the solid waste facilities." (Gov. Code, § 66780, subd. (b).) Public partic- ipation in the planning process is mandated, with the public to be given an opportunity "to respond to clearly defined alternative objectives, policies and actions." (Gov. Code, § 66780, subd. (c).)

The Act states a local government may reserve a site for expansion or a potential site for a solid waste facility only if the site is consistent with the general plan. (Gov. Code, § 66780.2, subd. (a).) This requirement is met if the local government has adopted a valid general plan, a solid waste management plan, the site expansion or potential site is so designated on the general plan, and the adjacent land uses are compatible with the solid waste facility. (Gov. Code, § 66780.2, subd. (b).)

The Act further provides, until a solid waste management plan is adopted, no new facilities can be established unless there is a need for "immediate implementation." (Gov. Code, § 66783.1.) Once a solid waste management plan is adopted, a new solid waste transfer station or disposal site may not be approved unless consistent with the solid waste management plan (Gov.

Code, § 66784) and the local government's general plan (Gov. Code, § 66796.41).[1]

The Act states that before issuance, modification or revision of a solid waste facility permit, it shall be ensured "primary consideration is given to preventing environmental damage and that the long-term protection of the environment is the guiding criterion." (Gov. Code, § 66796.33, subd. (a).)

Thus, under state law at the time of the amendment, which required adoption of a solid waste management plan and consistency with a general plan before approval of new or expanded solid waste facilities, the City's argument the uses were permitted without the amendment weakens considerably.

Finally, we note the zoning ordinances in the existing general plan which the City asserts permitted such facilities to be located in nonresidential areas by special use permits refer to "refuse and garbage dumps" (San Marcos Zoning Ord., § 480(15)) and "public utility and public service uses and structures, including, but not limited to, power and transformer stations" (San Marcos Zoning Ord., § 481(1)). It seems to us the facilities authorized in the City's solid waste management facilities designation are not merely "refuse and garbage dumps" nor merely "public utilities." We question whether these zoning categories encompass the facilities contemplated by the solid waste management facility designation.

V

The City argues that since the amendment required a special use permit and EIR before the development of any new use at the San Marcos landfill site, an EIR was not required at the time the amendment was adopted; a later EIR would be sufficient. The City states "California courts have repeatedly sanctioned the use of subsequent environmental evaluation of future projects subject to a special use permit requirement where the first project (GPA 02-84) does not commit the Lead Agency to those projects." To support this assertion, the City cites a number of cases: *City of Poway v. City of San Diego* (1984) 155 Cal.App.3d 1037 [202 Cal.Rptr. 366]; *Perley v. Board of Supervisors* (1982) 137 Cal.App.3d 424 [187 Cal.Rptr. 53]; *Lake County Energy Council v. County of Lake* (1977) 70 Cal.App.3d 851 [139 Cal.Rptr. 176]; *Plan for Arcadia, Inc. v. City Council of Arcadia*

---

[1]Exemptions are permitted for "[n]onprofit private resources recovery or recycling sites for neighborhood or community type activities approved by a local governmental entity" (Gov. Code, § 66784) and if the facility is not contrary to public interest, an insignificant quantity of solid wastes is to be disposed and the "nature of the solid wastes poses no significant threat to the public health, the public safety or the environment." (Gov. Code, § 66784.4.)

(1974) 42 Cal.App.3d 712 [117 Cal.Rptr. 96]; *Hixon* v. *County of Los Angeles* (1974) 38 Cal.App.3d 370 [113 Cal.Rptr. 433].

Significantly, only one of these cases (*City of Poway* v. *City of San Diego, supra,* 155 Cal.App.3d 1037) even tangentially involves a general plan amendment and in that case an EIR was prepared.[2] These cases involve specific projects (e.g., exploratory drilling, mining) and the question presented to the courts was whether a project was part of a larger project which required the local agency to address the larger project's potential cumulative effects or whether analysis of the cumulative effects from subsequent development could wait until such time as a permit for the later development was sought. The court in *Lake County Energy Council* v. *County of Lake, supra,* 70 Cal.App.3d 851, 854-855, observed: "While it is clear that the requirements of CEQA 'cannot be avoided by chopping up proposed projects into bite-size pieces' which, when taken individually, may have no significant adverse effect on the environment (*Plan for Arcadia, Inc.* v. *City Council of Arcadia* (1974) 42 Cal.App.3d 712, 726, [117 Cal.Rptr. 96]), it is also true that where future development is unspecified and uncertain, no purpose can be served by requiring an EIR to engage in sheer speculation as to future environmental consequences. [Citation.]"

 Under the City's argument, an EIR would never be required for a general plan amendment so long as somewhere down the road an EIR was required. That is not the law. The cases City cites do not support its position; those cases do not concern whether an EIR needs to be prepared for a general plan amendment. Generally, in cases involving general plan amendments, the local agency has either prepared an EIR or was required to do so. (See *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151 [217 Cal.Rptr. 893]; *City of Poway* v. *City of San Diego, supra,* 155 Cal.App.3d 1037; *Rural Landowners Assn.* v. *City Council, supra,* 143 Cal.App.3d 1013; *Twain Harte Homeowners Assn.* v. *County of Tuolumne* (1982) 138 Cal.App.3d 664, 678-679 [188 Cal.Rptr. 233]; *Environmental Council* v. *Board of Supervisors* (1982) 135 Cal.App.3d 428, 439-440 [185 Cal.Rptr. 363]; *Environmental Planning & Information Council* v. *County of El Dorado, supra,* 131 Cal.App.3d 350; *City of Santa*

---

[2]In *City of Poway* v. *City of San Diego, supra,* 155 Cal.App.3d 1037, the City of San Diego in approving a residential development amended its general plan. An EIR was prepared which addressed the environmental impact caused by the general plan amendment. The thrust of the case was directed at the adequacy of the EIR, an area where the scope of judicial inquiry is limited. The City of Poway contended the EIR failed to sufficiently address the cumulative effect of later development in the area. We held San Diego sufficiently addressed the environment concerns and more specific analysis could await and be appropriately delayed until approval of the later development was sought. Thus, in *City of Poway* v. *City of San Diego, supra,* unlike the instant case, there was an analysis of the potential environmental impacts of the general plan amendment.

Ana v. *City of Garden Grove, supra,* 100 Cal.App.3d 521; see also *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 278 [118 Cal.Rptr. 249, 529 P.2d 1017]; Cal. Admin. Code, tit. 14, §§ 15378, subd. (a)(1), 15127, 15146, 15166.)

 As the court noted in *City of Santa Ana* v. *City of Garden Grove, supra,* 100 Cal.App.3d 521: "The fact that the enactment or amendment of a general plan does not directly effect a physical change in the environment does not remove it from the scope of CEQA. . . . Under current law, general plans do have an ultimate effect upon physical changes in the environment.

" . . . . . . . . . . . . . . . . . . . . . . . . . . .

"The application of CEQA to the adoption or amendment of a general plan also comports with the policy that the environmental consequences of a proposed activity, whether public or private, be considered at the earliest possible stage. . . . Compliance with CEQA at the general plan stage will not result in wasteful duplication of EIRs if one is required. The report prepared at the general plan stage may be used 'as the foundation document for EIRs subsequently prepared for specific projects within the geographic area covered by the general plan.' (Guidelines, § 15068.5.)" (*Id.,* at pp. 531-533.)

 Even if a general plan amendment is treated merely as a "first phase" with later developments having separate approvals and environmental assessments, it is apparent that an evaluation of a "first phase-general plan amendment" must necessarily include a consideration of the larger project, i.e., the future development permitted by the amendment. Only then can the ultimate effect of the amendment upon the physical environment be addressed.

The fact later development or expansion of facilities can occur only after a permit is obtained and an EIR prepared does not excuse the City from addressing the potential environmental impacts of GPA 02-84. Such an evaluation should address whether the uses permitted by the designation and not covered by the 1977 EIR for the landfill should be allowed, even by permit, on these 202 acres. This is a separate question from the question whether a particular facility should be granted a permit in an area already carrying a solid waste management facility designation.

The fact future development is not certain to occur and the fact the environmental consequences of a general plan amendment changing a land

use designation are more amorphous does not lead to the conclusion no EIR is required. The CEQA guidelines (Cal. Admin. Code, tit. 14, et seq.) recognize an EIR for the amendment of a general plan will necessarily be less detailed. Section 15146 of the guidelines states: "(a) An EIR on a construction project will necessarily be more detailed in the specific effects of the project than will be an EIR on the adoption of a local general plan . . . because the effects of the construction can be predicted with greater accuracy.

"(b) An EIR on a project such as the adoption or amendment of a . . . general plan should focus on the secondary effects that can be expected to follow from the adoption, or amendment, but the EIR need not be as detailed as an EIR on the specific construction projects that might follow." Thus the CEQA guidelines address the City's argument that the difficulty of assessing future not-certain-to-occur impacts of a general plan amendment excuse preparation of an EIR; such difficulty only reduces the level of specificity required and shifts the focus to the secondary effects.

Moreover, in the instant case, it can hardly be said future projects were "unknown" or merely speculative. Our review of the administrative record leads us to the conclusion the general plan amendment here was adopted not merely to comply with state law in the abstract but as a necessary first step to approval of these "unknown," uncertain-to-occur future projects. This conclusion is based on the numerous comments addressed to the City council expressing concern about approval of a trash-to-energy plan. The representative of the company desiring to build this plant was one of the speakers at the hearing and has filed an amicus brief on appeal. The planning director noted an EIR for the proposed trash to energy plan had been in progress since August 1983, and stated the amendment would allow the City "to appropriately review and assess any future projects such as the trash to energy project or a proposed methane extraction project . . . ." Both of these allegedly "speculative" future projects were, in fact, approved within seven months of the general plan amendment: the resource recovery project in October 1984, the methane gas recovery project in March 1985.

Under these facts, it is apparent the City impermissibly "chopped up" the project into at least three separate projects—a general plan amendment, a trash-to-energy or resource recovery project and a methane extraction project. This is exactly the type of piecemeal environmental review prohibited by CEQA. ". . . CEQA mandates '. . . that environmental considerations do not become submerged by chopping a large project into many

little ones—each with a minimal potential impact on the environment—which cumulatively may have disastrous consequences.' [Citations.]" (*Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo, supra,* 172 Cal.App.3d 151, 165.) The CEQA guidelines require a project to be defined broadly (Cal. Admin. Code, tit. 14, § 15002, subd. (d)) and states if the project could be described "as either the adoption of a particular regulation . . . or as a development proposal which will be subject to several governmental approvals . . . [the city] shall describe the project as the development proposal for the purpose of environmental analysis." (Cal. Admin. Code, tit. 14, § 15378, subd. (d).) This the City did not do.

We question whether the Legislature intended local governments to site such facilities—as the trash-to-energy project contemplated here—through zoning for "garbage dumps" and "public utilities" in light of its mandate that local governments adopt comprehensive plans to address solid waste management, designate specific lands for such facilities, ensure compatibility of surrounding uses and ensure consistency of siting with the solid waste management and general plans.[3]

Finally and most important, to allow the resource recovery project approval to stand would be to sanction piecemeal environmental review, allowing one aspect of a project to be approved before the environmental consequences of the larger project are reviewed.

## VI

The City also argues Christward failed to present any substantial evidence supporting a fair argument the general plan amendment would have a potentially significant environmental impact. First, we think it is apparent the concentration of solid waste facilities in one particular area is likely to have a potentially significant environmental impact. Moreover, Christward at the hearing raised issues as to the impact of locating a trash-to-energy plant at the landfill site, a project clearly with potentially significant environmental consequences as demonstrated by the fact an EIR had been in progress since 1983 and the City attached 111 conditions to its issuance of a permit to the trash-to-energy facility.

---

[3]Government Code section 66796.41, subdivision (b)(1), states the requirement of consistency with a general plan for a new or expanded solid waste facility may be met "if an area is zoned for the siting of a solid waste facility which is designed to produce an alternative source of energy through conversion of solid waste material into energy, synthetic fuels, or reusable materials. . . ."

Christward also raised the potentially adverse effect on its religious retreat. The CEQA guidelines state a city in amending a general plan should address the secondary effects on the amendment. (Cal. Admin. Code, tit. 14, § 15146, subd. (b).) The guidelines also state "[e]conomic or social effects of a project may be used to determine the significance of physical changes caused by the project." (Cal. Admin. Code, tit. 14, § 15131, subd. (b).) The following example is given: "[I]f the construction of a road and the resulting increase in noise in an area disturbed existing religious practices in the area, the disturbance of the religious practices could be used to determine that the construction and use of the road and the resulting noise would be significant effects on the environment. The religious practices would need to be analyzed only to the extent to show that the increase in traffic and noise would conflict with the religious practices." (*Ibid.*) Christward presented evidence that the presence of solid waste facilities would disturb its religious practices, worship in the natural environment of the Cresthaven Retreat.

Moreover, Christward also pointed up the deficiencies in the City's own environmental analysis. The City's form initial study failed to list the address or legal description of the project. The "proposed use" was described only as "General Plan Amendment to the Land Use Element, specifically the Cresthaven/La Costa Meadows (South City) Community Plan." The space for size of the parcel was left blank. The initial study indicates the amendment is not part of a larger project, and does not involve a change in pattern, scale or character of the general area of the project. The initial study does not acknowledge a single environmental consequence.

The negative declaration also uses a check mark format with a series of possible environmental consequences and a choice of "yes," "no," or "maybe." Every possible environmental consequence is checked "no." What analysis was done was only in terms of the San Marcos Landfill. The negative declaration concludes the 1977 EIR for the landfill adequately addressed all environmental concerns. While CEQA permits, even encourages, the use of earlier EIRs (see Pub. Resources Code, § 21003), the 1977 EIR here does not suffice. It would be sufficient if all the City was doing by amending the general plan was acknowledging or renaming an existing use, but the City was doing much more. The 1977 EIR addresses only the landfill and failed to inform the City and the public of the possible environmental impacts from the designation allowing new solid waste management facilities at the site and the cumulative effect from those projects. Thus, the City's assertion it could find no "fair argument" there would be any potentially significant environment impacts rests, in part, in its failure to undertake an adequate environmental analysis.

The judgment is reversed and the writ of mandate should issue.

Wiener, J., and Jones, J.,* concurred.

*Assigned by the Chairperson of the Judicial Council.