[No. A038922. First Dist., Div. One. June 22, 1988.]

ROBERT T. SUNDSTROM, Plaintiff and Appellant, v.
COUNTY OF MENDOCINO et al., Defendants and Respondents;
HAROLD K. MILLER, Real Party in Interest and Respondent.

300

COUNSEL

Luke & Perry, Leslie R. Perry and Jan L. Turner for Plaintiff and Appellant.

Remy & Thomas and Sharon E. Duggan as Amicus Curiae on behalf of Plaintiff and Appellant.

H. Peter Klein, County Counsel, and Yves A. Hebert, Deputy County Counsel, for Defendants and Respondents.

Richard J. Henderson for Real Party in Interest and Respondent.

OPINION

**NEWSOM, J.**—Robert T. Sundstrom (hereafter appellant), appeals from a judgment of the Mendocino County Superior Court denying a petition for writ of mandate to set aside a use permit of Mendocino County (hereafter County) for noncompliance with the California Environmental Quality Act (CEQA). Appellant owns a shopping mall in the small unincorporated coastal town of Gualala. Real party in interest, Harold K. Miller (hereafter applicant or Miller), currently operates a small 17-unit motel with a 42-seat restaurant and filling station on the outskirts of town. He plans to build nearby a 40-unit motel with a 120-seat restaurant and cocktail lounge, manager's apartment, and 7-unit apartment. Located off Highway 1 on a bluff overlooking the ocean, the proposed development has been approved by the California Coastal Commission (Coastal Commission). The use permit at issue in this appeal concerns a private sewage treatment plant intended to serve the new development as well as Miller's existing motel complex.

For purposes of domestic waste disposal, Miller's businesses will have a population equivalent of 477 residents. The town of Gualala itself lacks a community sewage system and experiences widespread problems of seepage from overloaded septic systems. Acting on the advice of the Regional Water Quality Control Board, Miller proposes to build a relatively advanced and sophisticated waste disposal system—a tertiary treatment plant employing irrigation to dispose of treated water. The engineering firm designing the plant, the Clayton Engineering Company of St. Louis, Missouri, asserts that it will be constructed in a manner exceeding ordinary standards to assure reliable performance. In a letter to the Regional Water Quality Control Board, an official in the division of environmental quality for the State of Missouri confirms that plants of this design "do meet permit requirements." After reviewing preliminary plans, the Regional Water Quality Control Board approved the conceptual design and drafted discharge requirements providing, among other things, for a maximum of 8,700 gallons as the 7-day average of daily wastewater flow. Prior to construction, the regional board will review final design plans and specifications "to determine the adequacy of the proposed facilities."

The proposed site of the plant lies about 400 feet east of Highway 1 on a hillside just beyond the developed portion of Gualala. The land has a gentle gradient of 2 to 15 percent and is covered in equal portions by forest and meadow. The forest consists predominantly of bishop pine, redwood, and white fir with an understory of scotch broom, rhododendron and other coast brush species. The closest buildings, located on streets immediately to the west and south, are a machine shop, plumbing establishment, and a Baptist church described by a local resident as "a lovely white chapeled

church on a low hill in town, set in redwoods." Appellant's shopping mall lies 200 feet downhill from the proposed site.

The site, comprising about five acres, contains two small sewage lagoons that receive wastes from Miller's filling station. Upon construction of the treatment plant, the lagoons would be cleared and substantially enlarged so that they could store waste water from the motel/restaurant complex during the winter months. About two acres of the property are suitable for irrigation during the dry season of the year, the remainder being precluded by slope or soil conditions. The plans call for spray irrigation of the existing ground cover of forest, brush, and meadow.

After receiving Miller's application for a conditional use permit, the county planning staff filled out an "environmental checklist" intended to comply with regulatory provisions requiring an initial study to determine the necessity of an environmental impact report. The staff subsequently recommended that the planning commission grant the permit and adopt a negative declaration affirming that the environmental impact report is not required. Three conditions in the draft permit related to environmental considerations: that the treatment plant be "approved by the Regional Water Quality Control Board," that it comply with the regulations of the Air Pollution Control Board, and that a plan for sludge disposal "be approved by the Regional Water Quality Control Board and the Department of Public Health, Environmental Health Division."

The matter came up for hearing before the planning commission on February 27, 1986. When certain members of the public raised questions about the effect of the proposed irrigation on lower properties, the staff recommended two additional conditions: the submission of a hydrological study on the impact on adjacent sewage disposal systems and the establishment of a 50-foot buffer zone between the irrigation field and the street lying downhill to the west. But several commissioners still expressed concern that the Regional Water Quality Control Board had not submitted comments on the project. The commission deferred a decision and directed the staff to send the application and draft negative declaration to interested state agencies. (Cal. Code Regs., tit. 14, § 15073)

The county received substantive comments from the California Coastal Commission and the Regional Water Quality Control Board. The comment of the Regional Water Quality Control Board acknowledged potential problems relating to "ground and surface water hydrology" and "odor generation" from the plant and stated that the board would take these problems into account in reviewing the project plans and specifications. The Coastal

Commission objected specifically to the absence of a plan for sludge disposal.

When the matter came again before the planning commission on April 3, 1986, the staff drafted further conditions to the use permit in response to public objections. Most pertinent to this appeal, it recommended that the applicant obtain a second hydrological study investigating the impact of the proposed irrigation on problems of surface runoff. Despite these concessions, the planning commission divided evenly in a three-to-three vote on granting the use permit. Since the effect of the tie vote was to deny approval of the permit, Miller appealed the decision to the board of supervisors.

Responding to the expressed need for further hydrological studies, Miller retained a civil engineer, George C. Rau, to study the effects of the proposed irrigation on adjacent sewage disposal systems. Rau questioned the suitability for irrigation of land lying within about 200 feet of the street bordering the property to the west, but concluded that irrigation on a remaining parcel of about two acres would have no adverse impact on neighboring properties. His calculations indicated that the evapotranspiration rate of water sprinkled on these two acres would exceed the average daily flow of waste water from the treatment plant. To the extent that some percolation of ground water did occur, a layer of clay 18 to 30 inches below the surface would channel the subsurface flow to a neighboring ravine through a route bypassing appellant's property. As precautionary measures, Rau recommended that a "collection swale" be dug around "the perimeter of the irrigated area" and that roadside ditches along the bordering streets be enlarged.

At the board of supervisors hearing on April 28, 1986, Rau delivered a presentation based on his hydrological study. A consulting sanitarian, William G. Rummel, spoke in opposition to the permit application. When certain residents of the town expressed concern that the project would discourage organization of a sewage district, the staff proposed further conditions to the permit requiring Miller to join a community sewage system within two years of its establishment. By a four-to-one vote, the board of supervisors approved the permit as so amended and adopted the negative declaration.

Petitioning for writ of mandate, appellant alleged that the county "committed a prejudicial abuse of discretion by approving a negative declaration for the project in that the records contained substantial evidence to show the project may have a significant effect on the environment" requiring preparation of an environmental impact report. This appeal follows the trial court's denial of the petition.

Appellant raises both procedural and substantive objections to the County's adoption of a negative declaration with respect to the use permit. In brief, he contends that the initial study was a pro forma exercise, involving no real investigation, that failed to disclose the need for an environmental impact report. When environmental problems were raised in proceedings before the planning commission, the County responded by adding condition upon condition to the permit. Two of these conditions—the requirement of additional hydrological studies and approval of plans for sludge removal—were significant departures from CEQA procedures. As the application reached the final hearing before the board of supervisors, evidence of environmental problems accumulated. The applicant's own hydrological study provided the most persuasive arguments. But the County nevertheless approved the permit, subject to further conditions, and adopted a negative declaration. We will analyze, first, the procedural issues and, secondly, the evidence in the record relating to the need for an environmental impact report.

■ The "heart" of CEQA is the provisions requiring preparation of an environmental impact report (EIR). (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 84 [118 Cal.Rptr. 34, 529 P.2d 66].) Public Resources Code section 21151 provides: "All local agencies shall prepare, or cause to be prepared by contract, and certify the completion of an environmental impact report on any project they intend to carry out or approve which may have a significant effect on the environment." The objective of the EIR is "to compel government at all levels to make decisions with environmental consequences in mind." (*Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 283 [118 Cal.Rptr. 249, 529 P.2d 1017].) The EIR has been described as "an environmental 'alarm bell' whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return." (*City of Inyo* v. *Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377].) To this end, CEQA establishes precise procedures governing the preparation of the report.

■ "[T]he public agency which has the principal responsibility for carrying out or approving a project" is charged with determining the necessity of an EIR. (Pub. Resources Code, § 21067.) Under the guidelines implementing CEQA, this "lead agency" is directed to screen permit applications for environmental issues that might require environmental investigation. (Cal. Code Regs., tit. 14, § 15060.) "If there is a possibility that the project may have a significant environmental effect, the agency must conduct an initial threshold study. [Citation.] If the initial study reveals that the project will not have such effect, the lead agency may complete a negative declaration briefly describing the reasons supporting this determination. [Citations.] However, if the project may have a significant effect on the environ-

ment, an EIR must be prepared." (*Friends of "B" Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 1000 [165 Cal.Rptr. 514], fn. deleted; Pub. Resources Code, § 21080.1; Cal. Code Regs., tit. 14, § 15063.)

■ Appellant here challenges the sufficiency of the County's initial study. The requisite contents of the study are prescribed by CEQA regulations. (Cal. Code Regs., tit. 14, § 15063.) Public Resources Code section 21080.3 adds the requirement that the lead agency consult "with all responsible agencies and with any other public agency which has jurisdiction by law over natural resources affected by the project . . . ." Compliance with these formal requirements may be critical where the agency decision to prepare an EIR or negative declaration is directly challenged. (Pub. Resources Code, §§ 21080.1, 21167.) ■ Without a properly prepared initial study, the record may prove inadequate to permit judicial review of the agency decision. (Pub. Resources Code, § 21168.5; *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506 [113 Cal.Rptr. 836, 522 P.2d 12]; *Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo* (1985) 172 Cal.App.3d 151, 171-172 [217 Cal.Rptr. 893]; *Christward Ministry* v. *Superior Court* (1986) 184 Cal.App.3d 180, 197 [228 Cal.Rptr. 868].) But the petition for writ of mandate in the present case attacks the adoption of the negative declaration in connection with approval of the use permit. The record now extends well beyond the documents on which the initial study was based. Even if the initial study is defective, the record may be extensive enough to sustain the agency's action. Nevertheless, the legal sufficiency of the initial study has a certain relevance. In reviewing whether agency procedures comply with CEQA, the test to be applied is "whether an objective, good faith effort to so comply is demonstrated." (*Mount Sutro Defense Committee* v. *Regents of University of California* (1978) 77 Cal.App.3d 20, 37 [143 Cal.Rptr. 365].) The completion of a proper initial study is relevant to whether the agency made such a "good faith effort" to comply with the Act.

■ The initial study in fact displayed only a token observance of regulatory requirements. It consisted of a checklist of 43 questions that loosely paralleled the longer and more searching checklist proposed by the CEQA regulations. (Cal. Code Regs., tit. 14, div. 6, ch. 3, appen. H.) Each question could be answered by checking one of three columns: yes, no, or code. For our purposes, the only relevant code was number "2" which provided: "No significant environmental problems will occur if mitigation measures are adopted." The planning staff checked "no" for 38 questions and "code 2" for three questions relating to air and water quality and local services. In the case of several questions marked "no," later evidence clearly disclosed that the project would disturb existing conditions, e.g., change present drainage characteristics and alter local plant conditions. The checklist failed

to note "the source" or the "content of the data . . . relied upon," (*Citizens Assn. for Sensible Development of Bishop Area* v. *County of Inyo, supra,* 172 Cal.App.3d 151, 172; Cal. Code Regs., tit. 14, § 15063, subd. (c)(5)), to record consultation with other agencies (Pub. Resources Code, § 21080.3), to explain the proposed mitigation measures implied by use of "code 2" (Cal. Code Regs., tit. 14, § 15063, subd. (d)(4)), or to describe the project and the environmental setting (Cal. Code Regs., tit. 14, § 15063, subd. (d)(1) and (2)). The planning staff evidently did not ask the applicant to fill out the standard "Environmental Information Form" (Cal. Code Regs., tit. 14, div. 6, ch. 3, appen. I). or seek any professional opinion on environmental impact other than that of the civil engineer designing the project.[1]

Forced later to confront the hydrological problems presented by the proposed irrigation system, the staff devised the solution of requiring the applicant to submit hydrological studies relating to subsurface and surface drainage. Specifically, the use permit required: "A. 7. The applicant shall have a study prepared by a civil engineer with a hydrology background or a hydrologist which concludes that adjacent sewage disposal systems and surface and ground water hydrology will not be adversely affected by the proposed sewage facility. Said study shall be subject to review and approval by the Mendocino County Planning Commission and Mendocino County Division of Environmental Health. . . . A. 9. The applicant shall have a study prepared by a civil engineer which evaluates potential effects of the proposed development upon soil stability, erosion, sediment transport, and the flooding of downslope properties and contains recommended measures to minimize such impacts. Said study shall be subject to review and approval by planning and building services. Mitigation measures recommended by the study shall be incorporated as requirements of this use permit."

The requirement that the applicant adopt mitigation measures recommended in a future study is in direct conflict with the guidelines implementing CEQA. California Code of Regulations, title 14, section 15070, subdivision (b)(1) provides that if an applicant proposes measures that will mitigate environmental effects, the project plans must be revised to incorporate these mitigation measures "*before* the proposed negative declaration is released for public review . . . ." (Italics added.) Here, the use permit contemplates that project plans may be revised to incorporate needed mitigation measures

---

[1] Appellant's other objections to the initial study have no merit. The disclosure of the location of the plant was adequate. Although Miller identified the parcel as being 40 acres in his application, other documents make clear that he intended to use only the 5-acre section at the western end of the larger parcel. The use permit reflects this proposed location. The study also properly assumed that the plant would serve only the properties that Miller currently operates and proposes to build near the site. The plant design and the draft waste discharge requirements restrict the plant to these properties.

after the final adoption of the negative declaration. This procedure, we repeat, is contrary to law.

By deferring environmental assessment to a future date, the conditions run counter to that policy of CEQA which requires environmental review at the earliest feasible stage in the planning process. (See Pub. Resources Code, § 21003.1; *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, 84.) In *Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d 263, 282, the Supreme Court approved "the principle that the environmental impact should be assessed as early as possible in government planning." Environmental problems should be considered at a point in the planning process " 'where genuine flexibility remains.' " (*Mount Sutro Defense Committee* v. *Regents of University of California, supra,* 77 Cal.App.3d 20, 34.) A study conducted after approval of a project will inevitably have a diminished influence on decisionmaking. Even if the study is subject to administrative approval, it is analogous to the sort of post hoc rationalization of agency actions that has been repeatedly condemned in decisions construing CEQA. (*Id.* at p. 35; *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, 81; *Environmental Defense Fund, Inc.* v. *Coastside County Water Dist.* (1972) 27 Cal.App.3d 695, 706 [104 Cal.Rptr. 197].)

It is also clear that the conditions improperly delegate the County's legal responsibility to assess environmental impact by directing the applicant himself to conduct the hydrological studies subject to the approval of the planning commission staff. Under CEQA, the EIR or negative declaration must be prepared "directly by, or under contract to" the lead agency. (Pub. Resources Code, § 21082.1.) The implementing regulations explicitly provide: "The draft EIR which is sent out for public review must reflect the independent judgment of the lead agency." (Cal. Code Regs., tit. 14, § 15084, subd. (e).) Moreover, the EIR must be presented to the decisionmaking body of the agency. In *Kleist* v. *City of Glendale* (1976) 56 Cal.App.3d 770, 779 [128 Cal.Rptr. 781], the court held that the city council cannot delegate responsibility for considering the EIR to a planning board. By necessary inference, the board of supervisors cannot delegate the responsibility to the staff of the planning commission.

Finally, the use permit circumvents the provisions of CEQA governing the process of environmental review. The scope and content of an EIR or negative declaration are minutely prescribed under CEQA and its implementing guidelines. (Pub. Resources Code, §§ 21080, subd. (c), 21100; Cal. Code Regs., tit. 14, §§ 15071, 15120 et seq.) By merely requiring administrative approval of the hydrological studies, the use permit provides no similar guarantee of an adequate inquiry into environment effects. An EIR or negative declaration, moreover, are subject to review by the public and

interested agencies. (Pub. Resources Code, §§ 21080, subd. (c), 21092, 21153; Cal. Code Regs., tit. 14, §§ 15073, 15087.) This requirement of "public and agency review" has been called "the strongest assurance of the adequacy of the EIR." (*Sutter Sensible Planning, Inc.* v. *Board of Supervisors* (1981) 122 Cal.App.3d 813, 823 [176 Cal.Rptr. 342].) ▪ The final EIR must respond with specificity to the "significant environmental points raised in the review and consultation process." (Cal. Code Regs., tit. 14, § 15132, subd. (d); *People* v. *County of Kern* (1974) 39 Cal.App.3d 830, 841-842 [115 Cal.Rptr. 67].) If any substantial changes are proposed in a project after review of a draft EIR, it is necessary to prepare a supplemental EIR subject to the same scrutiny. (*Concerned Citizens of Costa Mesa, Inc.* v. *32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 936 [231 Cal.Rptr. 748, 727 P.2d 1029].) ▪ Here, the hydrological studies envisioned by the use permit would be exempt from this process of public and governmental scrutiny.

▪ The condition of the use permit relating to sludge disposal presents a distinct procedural issue. On its face, the condition is entirely proper; it merely provides that "[a]n approved plan for the disposal of sludge shall be approved by the Regional Water Quality Control Board and the Department of Public Health, Environmental Health Division." A negative declaration may include "[m]itigation measures, if any, included in the project to avoid potentially significant effects." (Cal. Code Regs., tit. 14, § 15071, subd. (e).) A condition requiring compliance with environmental regulations is a common and reasonable mitigating measure. (See *Perley* v. *Board of Supervisors* (1982) 137 Cal.App.3d 424, 430 [187 Cal.Rptr. 53].) The similar conditions in the use permit relating to compliance with air and water quality standards are beyond criticism. But the record discloses that the applicant presented no plans for sludge disposal and that no solution was readily available. Objecting to the use permit on this ground, the Department of Public Works of Mendocino County wrote, "[n]one of the County operated solid waste disposal sites can accept the 'sludge' from the proposed plant. We strongly recommend the use permit not be granted until the applicant has developed a satisfactory program for disposal of the 'sludge.'" When asked to comment on the negative declaration, the Coastal Commission also observed, "a satisfactory program for disposal of sludge has not been developed. As the sludge is a major product of the project, a disposal plan should be developed and reviewed for environmental effects before the negative declaration is approved."

In the case of the conditions regarding air and water quality standards, the County possessed "meaningful information" reasonably justifying an expectation of compliance. (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, 77, fn. 5.) Since compliance would indeed avoid significant envi-

ronmental effects, the conditions were proper. But the only information in the record concerning sludge disposal raised an obstacle to an environmentally satisfactory solution—the absence of any suitable disposal site in the county. By adopting the condition that applicant would comply with environmental standards for sludge disposal, the County effectively removed this aspect of the project from environmental review, trusting that the Regional Water Quality Control Board and the applicant would work out some solution in the future.

Under the regulatory guidelines of CEQA, an EIR is required if "there is substantial evidence that *any aspect of the project,* . . . may cause a significant effect on the environment, . . ." [Italics added.] (Cal. Code Regs., tit. 14, § 15063, subd. (b)(1).) The guideline reflects the judicial insistence on comprehensive judicial review of environmental problems under CEQA. Hence, the Supreme Court has demanded an EIR possess sufficient detail to help " ' "insure the integrity of the process of decision by precluding stubborn problems or serious criticism from being swept under the rug." ' " (*Concerned Citizens of Costa Mesa, Inc.* v. *32nd Dist. Agricultural Assn., supra,* 42 Cal.3d 929, 935.) In a different context, the court has prohibited the unnecessary division of a project into parts resulting in a piecemeal environmental review. (*Bozung* v. *Local Agency Formation Com., supra,* 13 Cal.3d 263, 283-284.) Having no "relevant data" pointing to a solution of the sludge disposal problem, the County evaded its duty to engage in a comprehensive environmental review by approving the use permit subject to a condition requiring future regulatory compliance. (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, 84.)

■ As we have noted, local agencies must prepare an EIR on any project "which may have a significant effect on the environment." (Pub. Resources Code, § 21151.) "[T]he word 'may' connotes a 'reasonable possibility.' " (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, 83, fn. 16.) The phrase "significant effect on the environment" is defined to mean "a substantial, or potentially substantial, adverse change in the environment." (Pub. Resources Code, § 21068.) Public Resources Code, section 21083, subdivision (a) underscores the concept of potential effects by requiring a finding that a project may have a significant effect on the environment if the "project has the potential to degrade the quality of the environment, . . ." (See also Cal. Code Regs., tit. 14, § 15065.)

The first Supreme Court decision construing CEQA held that the Legislature intended the act "to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language." (*Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].) In the land-

mark decision *No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, 84, the Court inferred that this principle of interpretation demanded "a low threshold requirement for preparation of an EIR." (Fn. deleted.) ■ The test is whether "it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact." (*Id.* at p. 75.) For purposes of judicial review, "[t]he trial court's function is to determine whether substantial evidence supported the agency's conclusion as to whether the prescribed 'fair argument' could be made. If there was substantial evidence that the proposed project might have a significant environmental impact, evidence to the contrary is not sufficient to support a decision to dispense with preparation of an EIR and adopt a negative declaration, because it could be 'fairly argued' that the project might have a significant environmental impact." (*Friends of "B" Street* v. *City of Hayward, supra,* 106 Cal.App.3d 988, 1002.)[2]

■ "[T]he existence of serious public controversy concerning the environmental effect of a project in itself indicates that preparation of an EIR is desirable. One major purpose of an EIR is . . . to demonstrate to an apprehensive citizenry that the agency has in fact analyzed and considered the ecological implications of its action." (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d 68, 85-86, fn. deleted.) This principle is now codified in California Code of Regulations, title 14, section 15064, subdivision (h) which provides: "In marginal cases where it is not clear whether there is substantial evidence that a project may have a significant effect on the environment, the lead agency shall be guided by the following factors: [¶] (1) If there is serious public controversy over the environmental effect of a project, the lead agency shall consider the effect or effects subject to the controversy to be significant and shall prepare an EIR."

■ In this case, the proposed motel and restaurant complex generated a degree of local controversy that, at the least, necessitated careful examination of the County's decision. When the Coastal Commission announced it would hold hearings on the project in Culver City, California, it received no

---

[2] An earlier case, *Pacific Water Conditioning Assn., Inc.* v. *City Council* (1977) 73 Cal.App.3d 546, 558 [140 Cal.Rptr. 812], followed the standard of judicial review applying to quasijudicial administrative agencies: the agency decision approving an EIR or negative declaration would be upheld if it was supported by substantial evidence in the record. But this standard of review nullifies the fair argument rule by upholding agency decisions that disregard fair arguments of environmental impact if they are supported by other evidence in the record. With a few exceptions, recent cases have followed the rule of *Friends of "B" Street.* (E.g., *Heninger* v. *Board of Supervisors* (1986) 186 Cal.App.3d 601, 608 [231 Cal.Rptr. 11]; *Bowman* v. *City of Petaluma* (1986) 185 Cal.App.3d 1065, 1071 [230 Cal.Rptr. 413]; *City of Antioch* v. *City Council* (1986) 187 Cal.App.3d 1325, 1331 [232 Cal.Rptr. 507].) It is now reflected in the language of the amendment of Public Resources Code section 21080, effective September 16, 1983, and California Code of Regulations, title 14, section 15070, promulgated effective August 1, 1983.

fewer than 14 letters protesting the choice of this distant location. The planning staff reported receiving numerous telephone calls concerning the sewage treatment plant. An internal memo written before the first planning commission hearing cautions, "[e]xpect major opposition." Local citizens spoke against the project at both the first and the second hearings. The project in fact sparked a local movement to organize a community sewer district, and nearly 50 letters concerning the project were on file with the county. While a substantial portion of the letters expressed criticism of the motel complex rather than of the water treatment plant itself, it is noteworthy that the County did not receive a single letter supporting the project while the matter was before the planning commission, and that only after an appeal to the board of supervisors was filed, did citizens write in support of the treatment plant.

While a fair argument of environmental impact must be based on substantial evidence, mechanical application of this rule would defeat the purpose of CEQA where the local agency has failed to undertake an adequate initial study. The agency should not be allowed to hide behind its own failure to gather relevant data. Thus, in *Christward Ministry* v. *Superior Court, supra,* 184 Cal.App.3d 180, 197, the city adopted an initial study and negative declaration concluding in brief, conclusory language that the project would not have a significant environmental impact. Ordering the preparation of an EIR, the court commented, "the City's assertion it could find no 'fair argument' there would be any potentially significant environment impacts rests, in part, in its failure to undertake an adequate environmental analysis." CEQA places the burden of environmental investigation on government rather than the public. If the local agency has failed to study an area of possible environmental impact, a fair argument may be based on the limited facts in the record. Deficiencies in the record may actually enlarge the scope of fair argument by lending a logical plausibility to a wider range of inferences.

The issue of sludge disposal offers a clear illustration of this principle. The record merely discloses that the plant is designed to hold but 3,900 gallons of sludge, and that no disposal site is available in the county. In the absence of any further information, the record thus permits the reasonable inference that sludge disposal presents a material environmental impact.

The sparseness of the record concerning potential vegetative change also suggests significant issues. CEQA of course extends its concern to such aesthetic dimensions of the environment. (Pub. Resources Code, §§ 21001, subd. (b), 21060.5; Cal. Code Regs., tit. 14, § 15126.) The mixed coniferous forest on the site, standing just beyond commercial and residential development, composes "an aesthetic background for the town of Gua-

lala." This forest cover is, moreover, an important variable in achieving a stable hydrological balance in the proposed irrigation field. The applicant's consulting engineer calculated that it would increase evapotranspiration 50 percent over a grass cover. Other evidence reveals an incipient problem of erosion in the western edge of the site. Presumably the vegetative cover will serve to prevent the widening of this problem.

The record suggests little previous disturbance of the site; it evidently contains a typical, but relatively complex, coastal ecosystem with abundant brush species as well as trees and meadows. The proposed sprinkler irrigation system will maintain the ground conditions of the rainy season throughout the year by keeping the soil continuously in a state of near saturation. What will be the effect of this uninterrupted soil humidity on an ecosystem adapted to seasonal drought? CEQA exists to compel local agencies to address questions like this. As the implementing guidelines recognize, CEQA's objective of preserving "high quality ecological systems" demands "an interdisciplinary approach which will ensure the integrated use of the natural and social sciences and the consideration of qualitative as well as quantitative factors." (Cal. Code Regs., tit. 14, § 15142; Pub. Resources Code, § 21000, subd. (b).) Some degree of interdisciplinary consultation may be necessary in an initial study as well as in preparation of an EIR. Without seeking the opinion of, say, a qualified botanist or ecologist, the planning commission staff was not in a position to dismiss the possibility of potentially adverse vegetative change.

Appellant protests, "[t]here are large number of redwood, white fir and red fir on this site. They cannot take that amount of water year round or they will surely die." We of course have no way of assessing the correctness of this contention, which, however, is unmet in the record. But, lacking the benefit of expert testimony, we can only conclude that the applicant may substantially alter the vegetative cover in a manner adverse to the scenic quality of the town and the hydrological balance of the proposed irrigation field.

The applicant's own engineering study reveals another potentially adverse environmental effect. The use permit prohibits irrigation along the western margin of the property in a buffer zone extending 50 feet from an adjacent street. But the engineering study questions the suitability for irrigation of an area extending approximately 200 feet from the street. The engineer, George Rau, found that most of the parcel has an impermeable clay layer lying close to the surface that would channel ground water toward a nearby gulch. On the western margin of the property, however, soil conditions change somewhat and the slope is more uncertain. The applicant assured Rau that he did not intend to irrigate within 100 feet of the street.

But without further study, Rau recommended irrigation no closer than about 200 feet from the street. On a map attached to his study, he designated a one-third acre area lying within 100 and 200 feet of the street as "Potential Irrigation Area with Further Study" and excluded the remainder of this border zone from the irrigation field. The soil near the western margin of the property was described as "slowly to very slowly permeable sandy clay. The slope of this material and its extent was not evident from the borings made." Appellant's expert, William Rummel, stressed the presence of erosion in this area. On this record, appellant raises a fair argument that the use permit allows the applicant to extend the irrigation field to an area where it would have potentially adverse effects on drainage and soil stability.

Though intended to reassure the County, Rau's study provides data for some of appellant's most telling arguments. The study estimates the rate of application of water by the proposed irrigation system and the rate of evapotranspiration on the site. Calculating that the rate of application would be less than the rate of evapotranspiration, Rau concluded that the irrigation system would not have adverse environmental effects. Both halves of his analysis present serious questions.

The study assumed that the irrigation system would deposit .16 inches of water per day on the site. Although he does not explain how he reached this figure, the context of the report—and appellant's calculations—suggest that it was based on a daily application of 8,700 gallons, the maximum discharge allowable under the draft order of the Regional Water Quality Control Board. Appellant argues forcefully that this calculation fails to take into account the disposal of waste water stored in holding lagoons during the rainy season. He calculates that the actual rate of application could be about twice this figure. Without substituting our calculations for those of a licensed civil engineer, we may observe that the firm designing the plant, Clayton Engineering Company, estimated a markedly different rate of application. In a letter dated March 31, 1986, it asserted that the irrigation system would spray "approximately 0.33 inches per acre per day" on the site. On this critical point, the record thus discloses the sort of disagreement among experts that under the CEQA guidelines may indicate the need for an EIR. (Cal. Code Regs., tit. 14, § 15064, subd. (h).)

Rau's calculation of the evapotranspiration rate is in reality a confession of his inability to find reliable data. The study states, "[w]hile we could find no specific studies which have been completed on rates of evapotranspiration it is common knowledge that 3 feet (36 inches) to 6 feet (72 inches) of water is needed to maintain permanent pasture during an irrigation season. The Hopland Field Station was used to conduct a study about the effect of

brush and tree removal on a watershed at Hopland. It was found that when trees and brush were stripped from the area and grass planted as ground cover, there was a 50% increase in runoff after a five year period. [¶] While the watershed study does not identify evapotranspiration directly, it can be inferred that the tree and brush cover uses at least 50% more water than grass cover. [¶] Following through on this reasoning, if 36 inches is required to keep a stand of grass cover over the dry portion of the year, then the tree cover could be expected to use 50% more or a total of 54 inches."

This process of reasoning added to such amorphous referents as—"common knowledge" of pasture irrigation and a single watershed study in another location—is used to construct a tenuous inference. Both premises lack any direct empirical basis in the climatic and ecological conditions actually existing on the site. Most disturbing, the calculations indicate a narrow margin of safety: the application of water, Rau calculated, will equal 73 percent of the expected evapotranspiration rate. In short, the study demonstrates the need for further investigation. If more precise estimates of the evapotranspiration rate are available, they should be brought to the attention of the County, and if the matter is inherently uncertain, the design of the plant should include fallback measures which take into account the margin of error in the calculations.

The hydrological study presents other uncertainties. The design engineers have not yet submitted a site plan showing precisely the size and location of the storage lagoons to be used in the rainy season. Rau acknowledged that he made no borings to determine the possibility of subsurface drainage from these lagoons. Again, a shallow ditch and small berm enclosing the irrigation field will intersect two small seasonal swales. The applicant has offered no data on the surface runoff in these watercourses. The environmental success of the treatment plant depends on maintaining a self-contained hydrological system, and the present state of the record permits a fair argument that the system may overload the absorptive capacity of the proposed site, increasing surface and subsurface drainage to the detriment of downslope properties.

For all of the above reasons we find that respondent County has failed to comply with the clear requirements of CEQA. Consequently, the judgment is reversed and the trial court is ordered to issue the requested writ of mandate. Costs to appellant.

Racanelli, P. J., and Holmdahl, J., concurred.

The petitions of respondent County and respondent Miller for review by the Supreme Court were denied September 14, 1988.