[No. B120456. Second Dist., Div. Six. Jan. 28, 1999.]

FAIRVIEW NEIGHBORS et al., Plaintiffs and Appellants, v.
COUNTY OF VENTURA et al., Defendants and Respondents;
TRANSIT MIXED CONCRETE COMPANY, Real Party in Interest and
Respondent.

COUNSEL

Kate M. Neiswender for Plaintiffs and Appellants.

McClintock, Weston, Benshoof, Rochefort, Rubalcava & MacCuish, Steven W. Weston and John A. Henning, Jr., for Defendants and Respondents and for Real Party in Interest and Respondent.

OPINION

STONE (S. J.), J.*—Fairview Neighbors and Tom Schleve (Fairview) appeal from the order of the trial court denying their petition for writ of administrative mandate. Fairview challenges the approval by respondent, the Ventura County (County) Board of Supervisors (Board), of the conditional use permit (CUP) to expand the mining operation of real party and respondent, Southdown, Inc., doing business as Transit Mixed Concrete Company (TMC), in rural Moorpark.

Fairview argues that the environmental impact report (EIR) violates the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.) by falsely stating that truck traffic under the "existing setting" would consist of 810 trips daily, and by speculating about air pollution, noise and biological impacts which would be created by the operation. Fairview contends that the analysis in the EIR of cumulative impacts is inadequate, and that the Board's approval of cement and asphalt manufacturing is inconsistent with the County's general plan. We affirm the order of the trial court.

FACTS

The project site has been mined since 1948. The mine supplies construction grade materials for building in the County. In 1961, the County issued CUP-1328 for mining operations on the site. In 1976, the County modified and renewed the CUP for a new owner and an EIR was prepared pursuant to

---

*Retired Presiding Justice of the Court of Appeal, Second District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

CEQA. The EIR for the 1976 CUP stated that the project generated 120 truck trips daily. The 1976 CUP did not set a cap on truck trips, but the 1976 CUP approved mining 1,800,000 million tons of aggregate which could generate 810 truck trips a day.

In 1993, when TMC acquired the site and took over the mining operations, an application was pending to modify the CUP to expand the boundaries of the site and increase the mine's production rate. TMC continued to promulgate the modification of the CUP, denominated as CUP-4633. While CUP-4633 was under consideration, CUP-1328 expired. In 1994, the County permitted TMC to continue operating the mine pursuant to a compliance agreement between the County and TMC while the County continued to consider CUP-4633. (County Ord. No. 8114-4.) The compliance agreement permits production at the level allowed under CUP-1328 which correlates to a daily average of 810 one-way heavy truck trips for the mine.

Other approved facilities operating at the site are plants to make concrete batch, road base and mortar by combining on-site sand with materials imported from off site. The site contains an asphalt batch plant which was not previously approved by CUP-1328 or the compliance agreement. The plant would make asphalt concrete using on-site sand as well as materials imported from off site.

The County released a draft EIR (DEIR) for public review and comment in 1991 and it held public hearings. Pursuant to the requests of TMC, the County released a revised DEIR and a second revised DEIR in 1994 and 1996. Additional public hearings followed. In 1996, the final EIR was completed and certified. The Board approved the project, including the asphalt batch plant.

Fairview filed its petition for writ of mandate with the trial court, challenging approval of the project under CEQA and contending that the project is inconsistent with the County's general plan, among other things. The trial court denied Fairview's petition for writ of mandate. This appeal ensued from the trial court's order denying the petition for writ of mandate.

### DISCUSSION

■  In reviewing the approval of a CUP, we consider whether the Board abused its discretion. (*Laurel Heights Improvement Assn.* v. *Regents of University of California* (1993) 6 Cal.4th 1112 [26 Cal.Rptr.2d 231, 864 P.2d 502] (*Laurel Heights II*).) Abuse of discretion in approving a CUP occurs only if the agency fails to proceed in the manner required by law or

substantial evidence does not support the Board's decision. (*Id.*, at p. 1133; *Western States Petroleum Assn.* v. *Superior Court* (1995) 9 Cal.4th 559, 571. [38 Cal.Rptr.2d 139, 888 P.2d 1268]; *Horn* v. *County of Ventura* (1979) 24 Cal.3d 605, 614 [156 Cal.Rptr. 718, 596 P.2d 1134]; Pub. Resources Code, §§ 21168.5, 21168.)[1]

■ The purpose of an EIR is to provide concerned citizens and decision-makers with information about the environmental consequences of project decisions before they are made; it is the heart of CEQA. (*Laurel Heights II*, *supra*, 6 Cal.4th at p. 1123.) Provided the EIR complies with CEQA, the Board may approve the project even if it would create significant and unmitigable impacts on the environment. (§§ 21002, 21002.1, subds. (b) & (c); Cal. Code of Regs., tit. 14, §§ 15043, 15091, 15092, subd. (a), hereafter Guidelines.)

■ Fairview opines that the EIR compared proposed, extrapolated truck traffic figures against a project that does not exist. Fairview argues that the EIR arbitrarily and speculatively determined that the existing traffic limit is 810 truck trips, rather than the actual, existing traffic. Fairview asserts that the EIR should have compared existing traffic without the mining operation against the "new" proposal. Similarly, Fairview contends that the Board improperly failed to require mitigation for air quality impacts anticipated to be generated by the project based on illusory traffic figures. Fairview argues that the Board improperly acted to extend an expired CUP; that TMC had no vested right to continue to mine. It also asserts that manufacturing asphalt may not be permitted in the area because it is zoned for rural residential use.

The EIR properly discussed the existing physical condition of the affected area as including the long-operating mine. (See *Benton* v. *Board of Supervisors* (1991) 226 Cal.App.3d 1467, 1473, 1476 [277 Cal.Rptr. 481], citing *Fund for Environmental Defense* v. *County of Orange* (1988) 204 Cal.App.3d 1538 [252 Cal.Rptr. 79] [in *Benton*, board considered request to expand an operating winery onto adjacent land as a modification of the existing winery project for purposes of evaluating the scope of review of environmental effects].) The "new" application at issue here, CUP-4633, had originally been filed as a modification of CUP-1328. The compliance agreement extended the entitlement previously permitted by CUP-1328, pending determination on the instant application. As in *Benton*, the mining project approved by CUP-1328 had already undergone environmental review. (See *Benton*, *supra*, at p. 1477, fn. 10.)

The instant EIR appropriately assumes the existing traffic impact level to be the traffic generated when the mine operates at full capacity pursuant to

---

[1]All statutory references are to the Public Resources Code unless otherwise stated.

the entitlement previously permitted by CUP-1328, as extended by the compliance agreement. The ongoing mining operation is an existing facility and the instant situation is akin to ones in which categorical exemptions to CEQA have been granted. (See generally, *Bloom* v. *McGurk* (1994) 26 Cal.App.4th 1307, 1312 [31 Cal.Rptr.2d 914] [where permitting agency extended the terms of expired permit for medical waste treatment facility pending review of new permit application, expiration of permit did not affect use of existing entitlement as baseline for evaluating project's impacts in that facility deemed to be exempt existing facility]; *Committee for a Progressive Gilroy* v. *State Water Resources Control Bd.* (1987) 192 Cal.App.3d 847, 864-865 [237 Cal.Rptr. 723] [reinstatement of higher capacity for existing wastewater treatment plant approved by Board and upheld on appeal as exempt existing facility]; *Fund for Environmental Defense* v. *County of Orange, supra,* 204 Cal.App.3d at p. 1543 [EIR for unused, expired permit for medical complex may be used as basis to issue permit five years later].) The production previously permitted under CUP-1328 is the daily average of 810 truck trips. Indeed, in 1989, peak operation of the mine under CUP-1328 generated 837 daily truck trips. A complete new EIR may not have been necessary here; a supplemental EIR, a narrowed EIR under the concept of "tiering" or a partial exemption may have been reasonable here. (See generally, *Gentry* v. *City of Murrieta* (1995) 36 Cal.App.4th 1359, 1373-1374 [43 Cal.Rptr.2d 170].)

Discussing the possible environmental effects of the project based on actual traffic counts would have been misleading and illusory under the facts here. The flow of traffic for a mining operation fluctuates considerably based on need, capacity and other factors. (See generally, *Hansen Brothers Enterprises, Inc.* v. *Board of Supervisors* (1996) 12 Cal.4th 533, 545-546 [48 Cal.Rptr.2d 778, 907 P.2d 1324] [permitting continued and expanded use of existing nonconforming mine under the diminishing asset doctrine].) In *Hansen,* our Supreme Court stated that "[t]he volume of material that has been mined and quarried in past years has been driven by market forces and has varied from year to year. Demand for the aggregate is seasonal and fluctuates with the needs of the building industry." (*Ibid.*) So it is here.

CEQA requires agencies to implement feasible mitigation measures or alternatives identified in the EIR. (§§ 21002, 21081; *Sierra Club* v. *State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1233 [32 Cal.Rptr.2d 19, 876 P.2d 505].) Fairview claims that the mitigation measures discussed by the Board are too speculative and improperly defer mitigation. Fairview attacks the mitigation measures approved for air, noise and biological impacts even though the EIR identified the impacts, discussed them and concluded that these impacts are

significant and presently unmitigable. It is improper for lead agencies to defer formulation of possible mitigation programs by simply requiring future studies to see if mitigation may be feasible. (See *Sundstrom* v. *County of Mendocino* (1988) 202 Cal.App.3d 296 [248 Cal.Rptr. 352].) But lead agencies may approve projects with significant, unmitigable impacts provided they adopt a statement of overriding considerations regarding those impacts. (*Laurel Heights II, supra,* 6 Cal.4th at p. 1124.) Here the Board found that it imposed on TMC all feasible mitigation measures, and it adopted a statement of overriding considerations as to the significant unmitigable impacts.

Condition of Approval No. 117 for CUP-4633 requires TMC to participate in a county vehicle emissions mitigation program (VEMP) for one year if the County Air Pollution Control Board (APCB) adopts VEMP. No mitigation of air quality impacts resulting from mobile emissions is required for the project if the County APCB does not adopt VEMP. Conditions Nos. 119 and 120 require TMC to participate both in the assessment district for the bypass of State Route 23 and in Moorpark's traffic noise monitoring program, if they are created, approved and funded. Condition No. 114 requires a biologist to create a habitat management and compensation plan (HMCP) for biological impacts also.

The Board found that air quality impacts of the project are significant and unmitigable. The EIR recommended that TMC be required to participate in any assessment district or other financing method to construct a bypass of State Route 23 and to participate in noise monitoring and enforcement on the public streets in Moorpark. The EIR explained that these programs may not be adopted, and if they are not, the noise and air quality impacts of the project would be significant and unmitigable. The Board found that such impacts would be significant and unmitigable and adopted overriding considerations concerning such impacts.

The EIR states that a HMCP would be prepared in the future subject to using standards and procedures not yet determined by a biologist not yet approved. Under *Sundstrom* and its progeny, such a "mitigation" measure is improper. But the instant EIR concludes that even if a HMCP and other biological mitigation measures are implemented, the impacts of the project on biological resources would be significant and unmitigable. A proposed "mitigation" measure which could not be effectual whenever and however attempted is illusory. The Board assessed the EIR, explaining the impact of the project on biological resources and the inability to mitigate those impacts. The Board properly adopted a statement of overriding considerations regarding these impacts.

*Sundstrom* is distinguishable from the instant case. In *Sundstrom*, a negative declaration relied on future proposed mitigation studies to provide presumed mitigation measures. That was improper. (*Sundstrom* v. *County of Mendocino, supra,* 202 Cal.App.3d at pp. 306-307.) It simply deferred environmental assessment to a future date after approval of the project. That is not what occurred here. Here the EIR explains what the environmental impacts would be, and it concludes that the impacts would be significant and unmitigable regardless of the proposed mitigation measures or future studies. Under such circumstances, the Board may adopt a statement of overriding considerations and approve the project. The EIR is only required to provide the information needed to inform the public and the decisionmakers of the significant problems which would be created by the project and to discuss currently feasible mitigation measures. (See *Sacramento Old City Assn.* v. *City Council* (1991) 229 Cal.App.3d 1011, 1028 [280 Cal.Rptr. 478].)

Fairview argues that the cumulative impacts analysis in the EIR is inadequate. They opine that the description of cumulative impacts in the EIR does no more than state the obvious: that more development will destroy resources. Fairview asserts that the EIR must be comprehensive and quite specific as to what the effects of the cumulative impacts would be.

■ The EIR must discuss cumulative impacts. (Guidelines, § 15130.) That is, the EIR must discuss the impacts of the project over time in conjunction with past, present and reasonably foreseeable future projects. (§ 21083; Guidelines, § 15130.) Guidelines section 15130, subdivision (b) provides that "[t]he discussion of cumulative impacts shall reflect the severity of the impacts and their likelihood of occurrence, but the discussion need not provide as great detail as is provided of the effects attributable to the project alone. The discussion should be guided by the standards of practicality and reasonableness." Thus, an EIR which completely ignores cumulative impacts of the project is inadequate. (*Citizens to Preserve the Ojai* v. *County of Ventura* (1985) 176 Cal.App.3d 421, 430-431 [222 Cal.Rptr. 247].) But a good faith and reasonable disclosure of such impacts is sufficient. (*Id.,* at p. 432; and see *Al Larson Boat Shop, Inc.* v. *Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 749 [22 Cal.Rptr.2d 618] [absence of separate detailed discussion of air quality impacts of project is not reversible error].)

■ Here, in addition to brief discussions of cumulative impacts on the various resource categories, a separate lengthy section of the EIR is devoted to analysis of the cumulative impacts of the project, supported by an eight-page appendix describing related projects and their known environmental impacts. The EIR discusses cumulative impacts of such projects on

air, traffic, noise and biological resources in the vicinity. The information provided in the EIR includes the number and distribution of vehicle trips for other nearby mines, annual rates of their production, sources of water, extant permits and future expansive plans. The information provided in the EIR regarding cumulative impacts satisfies CEQA.

Fairview attacks the approval of the asphalt and cement manufacturing aspect of the project as being inconsistent with the general plan. Neither the Public Resources Code, the County Code nor the California Code of Regulations defines manufacturing. The general plan designation for most of the project is open space with a mineral resource protection overlay. The mineral resource overlay permits manufacturing, exploration and extraction of materials and production and mining of various materials, among other things.

County Ordinance No. 8102-0 permits "[u]ses customarily incidental, appropriate and subordinate to mining located on the same site, such as . . . crushing; batching; recycling of concrete, asphalt and related construction materials; . . . and concrete products manufacturing which make use of the products produced from the subject mining site." (See *Markey* v. *Danville Warehouse & Lbr., Inc.* (1953) 119 Cal.App.2d 1, 5-6 [259 P.2d 19] [defining manufacturing as including making concrete].)

Fairview opines that because manufacturing is not allowed by the general plan, the asphalt batch plant may not be permitted. We disagree. Manufacturing is not limited to light or heavy industrial zones as posited by Fairview. County Ordinance No. 8102-0 provides some examples of permitted uses, including concrete manufacturing, as customarily incidental to various mining operations. We must construe zoning ordinances reasonably, considering the object to be attained and the general structure of the ordinance as a whole. (*Markey* v. *Danville Warehouse & Lbr., Inc., supra,* 119 Cal.App.2d at p. 5.) On its face, Ordinance No. 8102-0 permits batching and concrete products manufacturing, provided on-site materials are used in the process.

Here cement needs to be imported to manufacture concrete on site. County Ordinance No. 8102-0 specifically permits this. Making asphalt concrete also constitutes manufacturing. It requires importing materials to the site, but on-site sand constitutes 90 percent of the product by weight. Fairview admits that the ready-mix concrete meets the broad definition contained in Ordinance No. 8102-0. As the Board found, asphalt concrete meets the definition, too. The finding is supported by substantial evidence. (*Western States Petroleum Assn.* v. *Superior Court, supra,* 9 Cal.4th at p. 571.)

We uphold the order of the trial court denying the petition for writ of mandate. Costs are awarded to respondents and real party.

Gilbert, Acting P. J., and Yegan, J., concurred.

Appellants' petition for review by the Supreme Court was denied April 28, 1999.